UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 95-20885

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee

VERSUS

EDWARD JOHN JOHNSTON, III,
DARRELL WAYNE ADAMS,
ERIC DARNELL LOWERY,
LARRY J. HILL, AND
GONZALO J. ALVARADO

Defendants-Appellants

---

Appeals from the United States District Court
for the Southern District of Texas

October 27, 1997

Before POLITZ and KING, Circuit Judges, and DUPLANTIER*, District Judge.

DUPLANTIER, District Judge:

In this case involving a large scale, long term narcotics operation, defendants-appellants Edward Johnston, Darrell Adams, Eric Lowery, Larry Hill, and Gonzalo Alvarado appeal their convictions on a gallimaufry of grounds. In addition, Lowery, Johnston and Hill challenge their sentences. We affirm the

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

convictions except as follows: we reverse and remand for further proceedings as to Larry Hill's only conviction (count 1) and as to Darrell Adams' conviction of count 15. We affirm the sentences challenged by Lowery and Johnston.

PROCEDURAL HISTORY

The final superseding indictment upon which the government proceeded to trial charged the five appellants and five other individuals[1] with conspiracy (count 1) to possess with intent to distribute in excess of five kilograms of cocaine, fifty (50) grams or more of a mixture containing cocaine base, and 100 kilograms or more of marihuana, in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(A)(ii) and (iii), 841(b)(1)(B)(vii), and 846.

Darrell Adams was also charged with five counts of possessing cocaine with intent to distribute in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(A)(ii) and 18 U.S.C. 2 (counts 2, 4, 6, 7, and 8), one count of possessing cocaine base with intent to distribute in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(A)(ii) & (iii), and 18 U.S.C. 2 (count 3), five counts of possessing marijuana with intent to distribute in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(D) and 18 U.S.C. 2 (counts 5, 9, 10, 11, and 12), one count of conspiracy to commit money laundering in violation of 18 U.S.C. 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956 (g), and 18 U.S.C.

---

[1] Mark Adams, Felicia Lowery, Angie Tubbs, Mary Veal, and A.D. Ernest were indicted as co-conspirators. The judge granted Mary Veal's motion for mistrial. During the trial A.D. Ernest entered a plea of guilty. Mark Adams and Felicia Lowery were acquitted by the jury. The jury was unable to reach a verdict as to Angie Tubbs.

371 (count 14), and one count of using and carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. 924(c) (count 15).

In addition to the conspiracy count Alvarado was indicted on three counts of possessing cocaine with intent to distribute (counts 2, 6, and 7), and two counts of possessing marihuana with intent to distribute (counts 5 and 12).

The trial lasted approximately eight weeks. The district judge granted Adams' motion for directed verdict on one count of possessing marijuana with intent to distribute (count 11). Following several days of deliberations, the jury convicted all of the appellants on the conspiracy count. Adams was also convicted on four counts of possessing cocaine with intent to distribute, one count of possessing cocaine base with intent to distribute, two counts of possessing marihuana with intent to distribute, one count of conspiracy to commit money laundering, and one count of using and carrying a firearm in relation to a drug trafficking crime. The jury acquitted Adams on one count of possessing cocaine with intent to distribute (count 4) and two counts of possessing marihuana with intent to distribute (counts 9 and 12). Alvarado was convicted on all counts on which he was indicted.

Appellants were sentenced as follows:

- Johnston, imprisoned for 135 months and a five year term of supervised release.
- Adams, concurrent terms of life imprisonment on counts 1, 3, 7 and 8; 60 months on counts 5 and

3

10, and 240 months on counts 2 and 14, each of those
sentences to run concurrently, and a 60 month consecutive
term of imprisonment on count 15 (the gun count),
concurrent terms of supervised release, and a $25,000 fine.

- Lowery, imprisonment for 360 months, a five year term of
supervised release, and a $10,000 fine.

- Hill, imprisonment for 72 months, a three year term of
supervised release, and a $6,000 fine.

- Alvarado, concurrent terms of imprisonment of 340
months, 240 months and 60 months, concurrent terms of
supervised release, and a $20,000 fine.

## EVIDENCE

At the heart of this case is a widespread conspiracy to possess with intent to distribute marijuana, cocaine base, and cocaine, which operated from 1989 until 1994. Members of the conspiracy obtained large amounts of marijuana and cocaine in Houston, Texas and transported the drugs to Shreveport, Louisiana for distribution.

The government's case relied heavily upon the testimony of various participants in the conspiracy, including unindicted co-conspirators and indicted co-conspirators who entered into plea agreements with the government. Numerous law enforcement personnel and other witnesses also testified. Because of the nature of the errors urged by appellants, an extensive recitation of the evidence is necessary. We first review the evidence generally, as background for discussion of meritless claims of error by the

4

district court and of prosecutors' misconduct.  Concluding that some of the other misconduct claims are justified, we then discuss the effect thereof upon the convictions.

On December 3, 1991, Bosia Cash was stopped by a Diboll, Texas constable for a traffic violation. After seeing a gun in the vehicle and hearing Cash and his passenger Diane Mitchell give inconsistent accounts of their trip, the constable conducted a consensual search of the car and discovered three kilograms of cocaine. The constable arrested Cash and contacted John Marshall, a Shreveport DEA agent. Thereafter Cash agreed to cooperate with the DEA.[2] Agent Marshall and Cash attempted to arrange a controlled delivery of the cocaine to Roosevelt Wisener in Shreveport; however, the attempt was unsuccessful.  Cash then attempted to telephone appellant Adams.  When Adams returned Cash's call, in a recorded conversation he told Cash that Cash was responsible for "them people's cocaine."

Thereafter, with the cooperation of Cash, DEA agent Robert Mansaw, acting in an undercover capacity, attempted to purchase several kilograms of cocaine from Adams.  Adams failed to appear for a scheduled meeting with Mansaw, sending Roosevelt Gatterson, an unindicted co-conspirator, in his place.  A purchase of cocaine was ultimately arranged, but the deal was never consummated.  In recorded telephone conversations Mansaw and Adams discussed the

---

[2] Ultimately, Cash entered into a plea agreement with the government; he pleaded guilty to a single count of "using and carrying" a gun in relation to a drug trafficking crime in violation of 18 U.S.C. §924(c).

price of cocaine, and Adams told Mansaw that he would make sure Mansaw got his "package."

At trial Cash identified Adams, a resident of Houston, as his source of the three kilograms of cocaine he was transporting at the time he was arrested  and of other cocaine he had previously obtained. Cash described a prior transaction in which he delivered two kilograms of cocaine received from Adams to Danzel Morris. Morris refused to pay Cash for the cocaine, stating that Adams owed him cocaine.  Adams told Cash that he owed Adams for the lost cocaine.  Cash later gave Adams a race car and a truck as payment for the cocaine.  Adams told Cash that his source for cocaine was an individual known as "Charlie", whom Cash and several other witnesses identified as appellant Alvarado.

Adams introduced Cash to Stevenson McClendon and Roosevelt Gatterson.  McClendon worked with Adams at the Port of Houston. In a separate case, McClendon entered into a plea agreement in which he agreed, inter alia, to testify in this case.  McClendon testified that he introduced Adams and Alvarado in 1989, that in 1990 he bought kilogram quantities of cocaine for Adams from Alvarado, and that he made two trips to Shreveport to deliver cocaine for Adams, on each occasion delivering two to three kilograms of cocaine to Cash.  McClendon also testified that he witnessed Adams giving Alvarado money.

Gatterson also cooperated with the government and testified as follows.    After Adams bought ProCare Engine Exchange (ProCare), an engine installation business in Houston, Gatterson

6

worked there for approximately a year. In 1992 he picked up marijuana several times for Adams and delivered it to Shreveport, in vehicles belonging to Adams. Gatterson also delivered marijuana for Adams to Bruce Embrey and delivered kilogram quantities of cocaine to Shreveport for Adams, some of it to Cash. "Charlie" (Alvarado) provided Adams with the drugs. At Adams' request Gatterson picked up a tire containing cocaine from the side of Alvarado's house and delivered it to the barn where Adams' horses were stabled. Gatterson counted large amounts of cash at Adams' house on at least six occasions. At times while transporting drugs for Adams, Gatterson carried a gun provided by Adams.

In approximately May 1992 Albert Smith, then shop foreman at ProCare, arrived at ProCare early one morning and witnessed Gatterson and another man identified as Frank weighing white powder in the break room. Smith testified that he also saw the two men putting two packages of white powder in each of three tire rims. Several days after this incident, Adams required Smith to relinquish his keys to the ProCare building.

Kimela Lomax was paid for information provided to Agent Mansaw and testified for the government. She dated Adams for a number of months during the conspiracy and worked at ProCare after it was purchased by Adams. Lomax accompanied Adams on several trips to Shreveport, where Adams "took care of business" (his drug business). During these trips Adams met with appellants Lowery and Johnston. On several of these trips to Shreveport, Adams returned to Houston with large amounts of money. After Lomax and Adams

7

returned from one trip to Shreveport, Lomax and Gatterson helped Adams count more than $100,000.

Johnston delivered money to Adams' house in Houston twice while Lomax was present. Following one delivery of money by Johnston, Lomax helped count $90,000. Adams informed Johnston that the money was "short." Thereafter Johnston called Lowery, and Adams advised Lowery that they would be "minus one." Lomax testified "minus one" meant one kilo.

Adams told Lomax that "Charlie" was the source of his cocaine. In August 1993, Lomax and Adams went into hiding because they feared that their lives and those of Alvarado's family were in danger due to a delay in receiving money from Shreveport.

Bruce Embrey, an indicted co-conspirator who entered into a plea agreement with the government, worked at the Port of Houston and met Adams between 1989-1991. He testified that he purchased marijuana from Adams on several occasions and delivered that marijuana to Roy Patterson and A.D. Ernest, among others. Ernest was later employed by Adams at ProCare. After Adams purchased ProCare he asked Embrey to obtain kilogram quantities of cocaine. Embrey arranged for Adams to purchase two kilograms of cocaine from Sam Nash. Adams paid Nash the $28,000 purchase price, but the boxes delivered to Adams did not contain cocaine. Adams told Embrey that Embrey owed Adams for the loss. Thereafter, Embrey transported cocaine to Shreveport for Adams on two occasions, and on two occasions Embrey secreted cocaine in tires at Adam' request. On the second occasion Embrey put ten kilograms of cocaine into a

tire.

Roy Patterson, an unindicted co-conspirator, testified that he transported cocaine and marijuana from Houston to Shreveport for Adams. He stated that in May 1993, Lowery and Johnston appeared at the ProCare office. After Adams met with Lowery, Adams asked Patterson if he wanted to make a trip to Shreveport and suggested that Patterson talk to Lowery. Lowery asked Patterson to deliver thirty (30) pounds of marijuana to Shreveport. According to Patterson he agreed to make the trip, and Lowery gave him the number to call when he reached Shreveport. Johnston placed a bag in Patterson's trunk, which Patterson said he left at Lowery's house in Shreveport. Shortly thereafter Adams asked Patterson to make a second trip to Shreveport. Patterson testified that he picked up five (5) kilograms of cocaine from "Charlie" at the stables where Adams kept his horses, delivered the cocaine to Lowery, returned to Houston with $190,000 in cash given to him by Lowery, and delivered the cash to Adams at his home.

Patterson also testified about a second delivery of thirty (30) pounds of marijuana which he made shortly after that cocaine delivery. Patterson delivered the marijuana to Lowery, who then phoned appellant Hill. Patterson testified that within a few minutes Hill joined him and Lowery. Patterson brought the marijuana to the home of Jennifer Gerard, Lowery's sister and Hill's girl friend at the time. Hill unlocked the door and Patterson brought the marijuana into the house. Patterson testified that he, Lowery, and Hill weighed the marijuana.

Patterson testified about numerous other trips to Shreveport to deliver cocaine and marijuana, generally returning to Houston with large amounts of cash which he delivered to Adams. It was not uncommon for Patterson to transport six or more kilograms of cocaine on each trip. Patterson also testified that he accompanied Johnston on one trip to Shreveport to deliver marijuana to Lowery. On another occasion Patterson delivered to Edward Johnston in Houston four kilograms of cocaine ultimately destined for Shreveport. Patterson also assisted Adams in counting large sums of money several times.

On January 15, 1994, while transporting sixty (60) pounds of marijuana at Adams' request to Shreveport for delivery to Lowery, Roy Patterson was stopped and arrested. The marijuana was seized.

Derrick Patterson, Roy Patterson's son, testified that he accompanied his father on some trips to Shreveport and corroborated his father's testimony concerning several of the trips, including the testimony that Hill weighed the bundles of marijuana Patterson delivered on one trip.[3] After a trip to Shreveport, at Adams' request Derrick Patterson drove Adams' vehicle containing more than $300,000 cash back to Houston, where he delivered the money to Adams. He also witnessed Adams deliver cash to Alvarado; at ProCare he answered telephone calls from Johnston and Lowery for Adams.

Officer Henry King of the Shreveport police testified that while acting in an undercover capacity he purchased cocaine base,

---

[3] The testimony of the two Pattersons about this one incident is the only evidence of participation by Hill in the conspiracy for which he was convicted.

10

sometimes referred to as "crack", from George Robinson, an indicted co-conspirator who entered into a plea agreement with the government. King discussed with Robinson the possibility of purchasing large quantities of cocaine. Robinson told King that his source for cocaine was in Houston, identified Adams as the source, and gave King Adams' phone number. King made several attempts to set up a deal with Adams; however, no deal was ever consummated.

## COMMENT BY THE DISTRICT JUDGE

Roy Patterson, a convicted felon on probation during the time covered by the conspiracy, was cross-examined extensively by two defense counsel concerning his failure to comply with some conditions of his probation, e.g., using drugs and lying to his probation officer. Following those cross examinations, another defense attorney asked Patterson if he "ever [told] the probation officers and the drug counselors how much admiration you had for all the work they'd done for you?" The government objected to the question on the grounds of relevance and materiality. The judge stated:

> [t]he objection has been sustained. We've had a lot of examination about this man's probation and his failure to adhere to what he was supposed to do and the way he didn't disclose it to the probation officer. That's all well before the jury. I think we can get on to what the case is about.

(23 R. 37). Defendants moved for a mistrial; the motion was denied.

Adams, Johnston and Lowery contend that the district judge's statement deprived them of a fair trial because it eviscerated

11

their defense that the government's witnesses were not credible.

In determining whether a judge has exceeded the bounds of acceptable conduct, the proceedings must be viewed as a whole. *United States v. Dobbs*, 63 F.3d 391, 398 (5th Cir. 1995). The critical inquiry is "whether the judge's behavior was so prejudicial that it denied [the appellants] a fair, as opposed to a perfect trial." *United States v. Williams*, 809 F.2d 1072, 1086 (5th Cir. 1987), *cert. denied* 484 U.S. 896, 108 S.Ct. 506, quoting *United States v. Pisani*, 773 F.2d 397, 402 (2nd Cir. 1985).

Appellants' claim is without merit; the judge's comment did not deny Adams, Lowery, and Johnston a fair trial. Following the judge's statement, the cross examination of Patterson continued for a short while. Then the trial recessed for a lunch break. When the trial recommenced, the judge immediately instructed the jury as follows:

> Somewhere about a quarter an hour before we recessed at one point in time when objections had been made to examination -- cross examination being conducted by Mr. Gerson that were sustained, I made a remark, "Let's move along to what the case is about or something like that.
>
> I do not want you to take that remark as any indication that the case is not also about the credibility of witnesses because it always is. And, of course, as Mr. Gerson went on to do for some time, he asked a number of questions that bore upon the credibility of the witness he was cross-examining.
>
> As I will instruct you at the end of the case, one of the duties of the jurors will be to decide the credibility, which witnesses to believe, which witnesses not to believe, how much of each witness's testimony to believe, how much not to believe. That will all be part of the instructions at the end of the case.
>
> Certainly I did not mean to indicate to you at the

12

> time of that ruling by any offhand remark that credibility of witnesses is not important.  It is and its a proper area for cross-examination.

(23 R. 3751).

This timely instruction stressed the importance of the credibility of witnesses and informed the jury that it was their duty to determine credibility. Additionally, at the conclusion of the trial the judge instructed the jury that "[a]n important part of your job will be making judgments about the testimony of witnesses.  You should decide whether you believe what each person had to say and how important that testimony was." (40 R. 8177). The judge also told the jury that "[e]xcept for the instructions to you on the law and these instructions, of course, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts."  (40 R. 8176).  These instructions  amply guarded the appellants against any prejudice resulting from the district judge's statement.

## LIMITATION OF CROSS EXAMINATION

Lowery, Adams and Johnston assert that the district court committed reversible error by restricting the cross examination of Robert Mansaw concerning inconsistencies between his testimony and that of Roy Patterson.  Appellants urge that the limitation denied them their Sixth Amendment right to confront their accusers. Limitations on the scope of cross-examination are reviewed for abuse of discretion. *United States v. Route*, 104 F.3d 59, 64 (5th Cir.), *cert. denied*, ___ U.S. ____, 117 S.Ct. 2491 (1997).

Agent Mansaw was asked if when he spoke with Roy Patterson on

13

February 7, 1995, Patterson mentioned the name Larry Hill.  Mansaw replied, "[y]es, he did."  Defense counsel then asked "[s]o if he told the jury that he did not, that would have been an untruthful bit of testimony by Roy Patterson.  Is that what you want to say?" (36 R. 7191).  The government objected to the question on the basis that it was improper impeachment in that it called for an opinion. The objection was sustained.  The following colloquy ensued:

> MR. ACKERMAN:  Your honor, I'm not trying to prove what Mr. Patterson said to the jury.  I am confronting this witness with a prior statement.
>
> THE COURT:  That's going to be up to the jury to decide whether the witness testified truthfully or not.
>
> MR. ACKERMAN:  Your Honor, I'm not asking it in the form of a hypothetical, "If he so testified, would that have been true?  I agree that it's up to the jury to decide whether that's what he said.
>
> THE COURT:  I'll sustain the objection.
>
> MR. ACKERMAN:  Okay.  Your Honor, the Constitution of the United States gives me the right to confront witnesses called by the government.
>
> THE COURT:  You're doing that.
>
> MR. ACKERMAN:  And I'm being denied that right by limiting me in this regard and I object.
>
> THE COURT:  Sustain this objection.

(36 R. 7191-92).

Defense counsel elicited testimony from Agent Mansaw that was inconsistent with certain testimony given by Roy Patterson.  It was the jury's obligation to determine the credibility of Roy Patterson.  Agent Mansaw's opinion as to whether Patterson was telling the truth concerning his statement on February 7 is not

14

relevant. The district judge was correct in not permitting defense counsel to continue to pursue that line of inquiry.

ADMISSION OF RECORDS FROM PROCARE

Appellants Lowery, Johnston and Adams contend that the district judge erroneously admitted into evidence a large number of what they term "` business records' of ProCare" seized from ProCare's offices pursuant to a search warrant.[4] They contend that the proper foundation was not laid to admit the records under Rule 803(6) of the Federal Rules of Evidence, the business records exception. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Carrillo*, 20 F.3d 617, 619 (5th Cir.), *cert. denied*, _____ U.S. _____, 115 S.Ct. 261, 130 L.Ed.2d 181 (1994).

Appellants' contention lacks merit. The records at issue are of a business (ProCare) owned and operated by appellant Adams, not documents of a third party, and were seized on the premises of ProCare. As such, the documents are admissible once their authenticity is established regardless of whether they fit the business records exception. Authenticity is established "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). These documents were properly authenticated. Agents Timothy Binkley and Anderson Jackson participated in the search of the

---

[4] Appellants do not specify which exhibits they contend were admitted in error. They simply identify portions of the transcript where various exhibits were offered into evidence by the government, objected to by defendants, and then admitted into evidence.

ProCare premises and testified concerning the circumstances under which the documents were seized. ProCare employees Kimela Lomax and Karen Franklin also authenticated the documents.

In any event, a proper foundation under Rule 803(6) was established for the exhibits. Both Kimela Lomax and Karen Franklin, who handled record keeping for Adams at ProCare, testified that the documents at issue were kept in the regular course of business and relied upon by Adams. This satisfied Fed. R. Evid. 803(6). The district judge properly admitted the exhibits into evidence.

## PROSECUTORIAL MISCONDUCT

All appellants contend that various acts of misconduct by the prosecutors, viewed either individually or cumulatively, denied them a fair trial, requiring reversal of their convictions. Criminal defendants bear a substantial burden when they attempt to show that prosecutorial improprieties constitute reversible error. United States v. Bermea, 30 F.3d 1539, 1563 (5th Cir. 1994), *cert. denied sub. nom.*, 513 U.S. 1156, 115 S.Ct. 1113, 131 L.Ed.2d 746 (1995). "[A] conviction should not be set aside if the prosecutor's conduct . . . did not in fact contribute to the guilty verdict and was, therefore legally harmless." United States v. Cardenas, 778 F.2d 1127, 1129-30 (5th Cir. 1985) (citations omitted).

The acts of claimed prosecutorial misconduct range from the frivolous to the egregious and fall into several different categories. A careful review of the briefs, oral argument, and the

16

trial transcript convinces us that the following complaints lack merit and do not require further discussion: the prosecutors' personal actions towards defense counsel, including approaching counsel in a menacing way, calling irrelevant witnesses, addressing defense counsel directly, physically "charging" a defense counsel who stated an objection, referring to defense counsel as "criminal defense counsel", and the government's breach of its plea agreement with George Robinson, who is not an appellant here. However, each of the following warrants detailed analysis: discovery violations, open display of unadmitted exhibits, references to Adams' prior conviction, improper questioning of law enforcement officers, and comments on defendants' failure to testify.

## A. Discovery Violations

Lowery, Adams and Johnston contend that the government repeatedly violated the district court's discovery orders and failed to disclose *Brady*[5], *Giglio*[6], and *Jencks*[7] material in a timely manner. Appellants do not allege any specific prejudice resulting from the delayed productions. Rather, in general terms they assert that they were prejudiced because the delayed disclosures diverted defense counsels' attention "from the tasks of defending to the task of preparing." (34 R. 6761).

The government clearly delayed in producing a number of

---

[5] *Brady v. Maryland*, 373 U.S.83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)

[6] *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

[7] 18 U.S.C. 3500

discovery materials. At the final pretrial conference the district judge ordered the production of *Jencks* material on the day before the witness would testify. Despite that order, the government failed to produce the tape recorded statement of Kimela Lomax or even disclose its existence until after several defense counsel had completed their cross examinations of Lomax. The tardy production of the tape necessitated a postponement of Lomax's cross-examination to allow defense counsel an opportunity to review the tape and prepare appropriate cross-examination.

Prosecutors did not reveal the existence of a plea agreement with Bosia Cash prior to his direct testimony, and contrary to the district judge's order, produced a transcript of Cash's testimony before the grand jury only after Cash began testifying. The government was also dilatory in producing its plea agreement with Stevenson McClendon; the agreement was first produced on the day he testified.

We disagree with appellants' complaint that a video tape of a traffic stop involving Edward Johnston and a recorded statement of Marilyn Timmons were produced late. The government produced the tape of the traffic stop several days before the date that the officer who executed the stop testified, and the tape of Timmons several days before Timmons, who was not actually called to testify, was scheduled to testify.

The record also does not support Lowery's contention that the prosecutor did not timely disclose information concerning the payments made by Agent Mansaw to Kimela Lomax. The prosecution did

18

timely inform defendants of the total amount of payments made to Lomax, although the actual payment vouchers were not produced until Lomax's cross-examination.

Appellants also argue that the prosecution failed to disclose "informal immunity" agreements entered into with several witnesses, including Derrick and Roy Patterson. In fact, there were no such immunity agreements. Before the trial began, a prosecutor indicated that Gatterson, Lomax, Derrick Patterson and Roy Patterson had received "informal immunity" from agents involved in the investigation of the case. In response to defendants' motion to disclose the agreements, the prosecutor stated that there were no such agreements, and that he had inferred their existence from the fact that those witnesses had been interviewed without having been given *Miranda* warnings. The agents involved were cross-examined extensively about the existence of such agreements, and they confirmed that there were none. The government cannot disclose that which does not exist.

Appellants also contend that several times the government attempted to call witnesses to testify without giving one day's prior notice of their appearance, contrary to the judge's orders, and that these violations resulted in trial delays. They also complain of a delay that ensued when the prosecution failed to timely provide defense counsel with a copy of a summary chart. Appellants articulate no specific prejudice due to the alleged trial delays.

The fact that the witnesses were not identified and materials

19

were not produced in accordance with the judge's prior orders does not equate to prosecutorial misconduct. "The trial court holds real latitude in the management of the discovery process, including fashioning the appropriate remedy for alleged discovery errors." *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991). We review alleged errors in the administration of the discovery process for abuse of discretion. *Id.* Delayed production is not in and of itself a ground for reversal of a conviction. Prejudice to the substantial rights of a defendant is required before reversal of a conviction is warranted. *United States v. Garcia*, 917 F.2d 1370, 1374 (5th Cir. 1990).

The delayed identifications and productions did not prejudice appellants' substantial rights. We do not condone the government's less than satisfactory compliance with the district judge's discovery orders; however, we recognize that this was a long and difficult prosecution. The trial began with ten defendants and a fifteen count indictment. There were a large number of potential witnesses and exhibits. These factors imposed an unusually heavy administrative burden on the government, and adversely affected the prosecutors' ability to comply with the discovery orders. Although the district judge voiced his displeasure concerning the prosecution's repeated failure to timely produce discovery materials, he determined that the delays were not intentional and did not prejudice the appellants. Our review of the record does not persuade us otherwise.

Moreover, the district judge, cognizant of the potential for

prejudice inherent in the late disclosures, postponed the examination or cross-examination of every witness where there was either a late disclosure of discovery materials or a failure to timely reveal the identity of a witness who would be called. These postponements gave defense counsel an adequate opportunity to examine and analyze the material produced and adequately prepare a cross-examination of the witness. Appellants did not experience any prejudice to their substantial rights due to the prosecutors' discovery violations.

### B. Display of Guns and Drugs

Appellants contend that the prosecutors acted improperly at the start of the trial by displaying on the prosecutor's table in the plain view of the jury various drugs and weapons which had not been admitted into evidence. Defendants timely objected to the display. Outside the jury's presence, the judge ordered the government not to display anything on the table that was not on the exhibit list. The judge then instructed the jury:

> Ladies and gentlemen, with respect to the exhibits that -- or potential exhibits that are on the table, these are not in evidence. There's a weapon of some type lying out there on that table and other paraphernalia. You are not to consider those for any purpose at this time. Those are not exhibits in evidence at this time. There are no exhibits in evidence at this time.
>
> Whether those will come into evidence or not I don't know. But you're going to consider in this case only the exhibits and you are not to be in any way influenced by anything that you have seen in connection with materials lying on the tables of counsel at this time. That is not in evidence. We have not had any testimony. We've not had any exhibits at this time.

21

(12 R. 221, 236-37).

Because neither the government nor the appellants recall specifically what items were displayed on the table, we are unable to determine whether all of the items displayed on the table were later admitted into evidence. However, the record does demonstrate that a gun and several exhibits of cocaine were admitted. Considering the district judge's instruction to the prosecution to remove any items which were not listed on the witness list, the lack of a record indicating that any displayed item was not admitted into evidence, and the judge's thorough instruction that the items displayed were not evidence, we conclude that appellants suffered no prejudice from the display.

### C. References To Adams' Prior Convictions

Adams contends that the prosecutors acted improperly by intentionally eliciting testimony concerning and commenting upon his prior criminal record, despite the fact that the judge had granted a motion in limine prohibiting such references.[8] Appellant does not provide a record reference for either the motion or an order granting it, and we found none in reviewing the record. Nevertheless, assuming *arguendo* that such a motion was granted, under Rule 103 of the Federal Rules of Evidence, the "plain error" standard of review applies if at trial the defendant failed to timely renew the objection raised by motion *in limine*. *United*

---

[8] Johnston adopted this portion of Adams' brief. Because the challenged testimony and comment do not pertain to Johnston, he could not have experienced any prejudice. Accordingly, we limit our discussion to Adams.

*States v. Graves*, 5 F.3d 1546, 1551 (5th Cir. 1993), *cert. denied sub. nom.*, 511 U.S. 1081, 114 S.Ct. 1829, 128 L.Ed.2d.459 (1994).

Three separate incidents form the foundation for Adams' challenge. Kimela Lomax testified that a vehicle in which she and Adams were riding was stopped by law enforcement officials, and that there were guns in the vehicle. She testified, without objection, that she and Adams were charged with the offense of carrying a weapon. On cross-examination, Lomax testified that she pleaded no contest to the charge and received probation. Thereafter, on redirect examination, a prosecutor asked Lomax "[w]e know what happened to you. What happened to Darrell?" Lomax answered, "[h]e got probation." (27 R. 5086).

There was no objection to the question at that time, although counsel later filed a motion for mistrial based in part on the question concerning Adams' prior conviction. The failure of counsel to object to the admission of the evidence at the first available opportunity waived any ground of complaint against its admission, absent plain error. *United States v. Vesich*, 724 F.2d 451, 462 (5th Cir. 1984). When a defendant has forfeited an error by failing to object, the error is remedied only "in the most exceptional cases." *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994)(*en banc*), *cert. denied*, ____ U.S. ____, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). Plain error is "error so obvious and substantial that failure to notice it would affect the fairness, integrity, or public reputation of the judicial proceedings and would result in manifest injustice." *United States*

23

*v. Reyes*, 102 F.3d 1361, 1364 (5th Cir.), *cert. denied*, ____ U.S. ___, 117 S.Ct. 180, 136 L.Ed.2d 166 (1996). The prosecutor well knew that the question would elicit evidence that the defendant had a prior conviction; evidence that was irrelevant and prejudicial, and in violation of Rule 404(b) of the Federal Rules of Evidence. The prosecutor acted improperly in asking the question; however, we conclude that the misconduct does not satisfy the high standard required to qualify as plain error.

The second incident occurred when, after Lomax's testimony that Adams was sentenced to probation, the prosecutor asked Lomax "[d]id you ever have conversations with Darrell Adams about his concern" (previous questions made it clear that the prosecutor was referring to concern about going to the penitentiary). Defense counsel's objection was overruled. Lomax answered, "[h]e said he wasn't worried about going back", thus telling the jury that Adams had once before been to the penitentiary. No objection was stated at that time.

Because Adams did not object to the comment at the first opportunity available, we review for plain error. Although Lomax's response to the question of Adams' concern about going to the penitentiary was not responsive to the question in the strictest sense, that does not factor into our analysis because we can safely assume that the prosecutor was indeed soliciting the answer which the witness gave. The government's introduction of evidence that the defendant had previously served a penitentiary term was clearly improper, but the following court instruction alleviated the

24

resulting prejudice:

> First, I want to instruct you that I am striking one of the responses of Ms. Lomax that she gave in reply to a question yesterday. There was a question asked whether Ms. Lomax had conversations with Darrell Adams about his concern. Ms. Lomax, instead of answering "yes" or "no," which would have been all that the answer called for, answered with a statement that I'm going to instruct you to disregard entirely. You are not to speculate upon it at all.
>
> The answer was said he wasn't worried about going back. That answer is stricken from the record. It was an improper response. You are instructed to disregard it completely and to pay no attention to it or speculate upon it at all in any of your considerations about this case.

(28 R. 5117) The instruction was thorough, and "juries are presumed to follow their instructions." *United States v.Castillo*, 77 F.3d 1480, 1491 (5th Cir.), *cert. denied,* _____ U.S. ____, 117 S.Ct. 180 (1996). The prejudice is also mitigated by the fact that the jury later learned from Adams himself that he had previously been in the penitentiary. *See United States v. Davis*, 831 F.2d 63, 65 (5th Cir. 1987). In a taped conversation between Adams and Robert Mansaw, Adams stated "I done been down that road . . . penitentiary . . . and I got [sic] going back."

Finally, Adams objects to the following portion of the government's closing argument:

> [Roosevelt Gatterson's] been to prison for dope. He kind of felt that he and Darrell had a lot in common, that they had a lot to talk about, they were kind of kindred spirits, had common background.

(39 R. 7805). Adams did not object to the comment. Accordingly we review the statement for plain error. *United States v. Bermea*, 30 F.3d 1539 (5th Cir. 1994), *cert. denied sub. nom.*, 513 U.S. 1156,

25

115 S.Ct. 1113, 131 L.Ed.2d 746 (1995).

We disagree with appellants' contention that the statement is a direct comment on Adams' prior conviction; the "common background" referred to could reasonably be construed as a background in narcotics trafficking.

### D. Improper Questioning of Law Enforcement Agents

Appellants characterize numerous questions by prosecutors to law enforcement agents as objectionable to such an extent that, considered together, they constitute prosecutorial misconduct. We therefore review them as such, rather than as claimed error by the trial court with respect to evidentiary rulings. Appellants contend that the prosecutors intentionally and repeatedly questioned law enforcement agents in a manner calculated to violate the Confrontation Clause of the Sixth Amendment. By asking law enforcement officials what steps they took during their investigation and why they took those steps, appellants assert that the prosecutors were able to indirectly introduce damaging hearsay testimony of informants and law enforcement officials. They also contend that the prosecution asked improper questions designed to elicit irrelevant testimony which was prejudicial.

Rule 803 of the Federal Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Out-of-court statements offered for another purpose, e.g., providing background information to explain the actions of investigators, are not hearsay. *United States v.*

26

*Carrillo*, 20 F.3d 617, 620 (5th Cir.), *cert. denied*, ____ U.S. ____, 115 S.Ct. 261. 130 L.Ed.2d 18 (1994), citing *United States v. Gonzalez*, 967 F.2d 1032, 1035 (5th Cir. 1992).

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . .." Fed. R. Evid. 403. "The more directly an out of court declaration implicates the defendant, the greater the danger of prejudice." *United States v. Carillo*, 20 F.2d at 620. If an out-of-court statement does not directly implicate the defendant, then the probative value outweighs the prejudice. *Id.* Appellants Johnston, Lowery, Hill and Adams point to numerous instances of alleged improper questioning[9]; we address only those instances where an appellant is directly implicated.

Michael Hembree, a DEA agent, testified that he and Agent Margaret Brice, a deputy narcotics investigator with the Caddo Parish Sheriff's Office, interviewed Tracy Boston, who was in custody at the Shreveport jail. The AUSA then asked Hembree: "[c]an you tell the members of the jury what you did after you spoke with Tracy Boston." (20 R. 2761). Defendants' objection was overruled and Hembree answered:

> We refocused [our] investigation more narrowly
> to certain individuals and activities that were
> being conducted specifically by certain individuals
> and their part as partners in a drug organization,
> other specific parts in that organization.

*Id.* When the prosecutor later asked "if [he] went any other place

---

[9] Lowery alone cites more than one hundred fifty examples of questions or portions of testimony which he contends are improper.

27

or examined any other records or did anything other thing after that", Hembree stated that he had a conversation with Agent Brice. *Id.* The prosecutor then asked Hembree the nature of the conversation, and Hembree replied "Eric Lowery, Felicia Metcalf Lowery, the conversation was regarding Eric Lowery, Felicia Metcalf Lowery and a residence located at 9469 Pitch Pine Road in Shreveport." (20 R. 2762).

The prosecutor's questions succeeded in demonstrating to the jury that information conveyed to Hembree by Boston and Brice incriminated Lowery; the information was probably inadmissible per se, and the sources were not subject to cross examination. An earlier effort by the prosecutor to reveal to the jury the topic of Hembree's conversation with Boston had already been thwarted. When the prosecutor asked Hembree about the topic of his conversation with Tracy Boston defense counsel objected, and the objection was sustained. The challenged question, i.e., the nature of the conversation between Hembree and Brice (clearly a rehash of the Boston interview) came almost immediately after the objection to the prosecutor's question concerning the topic of Hembree's discussion was sustained. The prosecutor's later question, which was objected to by defendants, put before the jury in an indirect manner the same irrelevant hearsay testimony which the district court had prohibited the prosecutor from eliciting. To the discredit of the prosecutors, this was not an isolated situation.

A similar instance involved the testimony of Deputy Robert Davidson of the DeSoto Parish Sheriff's Office. Davidson

28

testified that he talked to Don Johnson of the Shreveport Police Department. He was then asked "[w]hat did you do after talking to Don Johnson with the Shreveport Police Department." (17 R. 1772). Following defendants' objection to the question which was overruled, Davidson answered that he "continued surveillance and focused investigation on more than Renee Smith." *Id.* Davidson was then asked "[w]ho did you focus the investigation on?" (17 R. 1772). Defendants objected to the question; however, the district judge overruled the objection and instructed the jury that "this is being offered not for the truth of the matter, that may have been said to him, but rather to show simply a basis for action here at this point." *Id.* There was, of course, a basis for this ruling, just as the judge instructed the jury.

Nevertheless, Davidson's answer: "Darrell Adams and George Robinson" demonstrated that the evidence should have been excluded. (17 R. 1773). The identity of the "focus" of the investigation had limited, if any, probative value. It was entirely unnecessary to explain the basis for further activity by the witness. By any account the probative value was insufficient to offset the prejudice to Adams resulting from the direct implication that a Shreveport policeman, not subject to cross-examination, had given information, itself probably not admissible, which caused defendants to become the "focus" of a narcotics investigation. *See United States v. Gomez*, 529 F.2d 412, 416 (5th Cir. 1976).

The prejudice to Adams was compounded when Davidson was allowed to answer the prosecutor's inquiry as to "what else did you

29

focus your investigation on?". (17 R. 1774). Davidson replied "ProCare Engine Exchange in Houston." Id. Because the jury had before it evidence that Adams owned ProCare at the time of Davidson's investigation, this response (surely anticipated by the prosecutor) further implicated Adams.

There are several additional examples which, although they do not involve "opinion" evidence as to defendant's unlawful activities directly, do so implicitly. In those instances, the jury would reasonably infer that information obtained in an out of court conversation between a testifying police officer and an informant or other law enforcement officer implicated a defendant in narcotics activity. For example, a prosecutor asked Mike Kellum:

> [d]uring the course of your narcotics investigation have you become familiar with the names Eric Lowery and Larry Hill as focuses of any narcotics investigation in Shreveport?

(17 R. 1727). Defendants objected to the question, and the objection was sustained. The prosecutor then explained to the district judge that she was attempting to ask Agent Kellum if he had personal knowledge of that information. The judge told Kellum that he could answer if he had "personal knowledge." Kellum replied "[y]es, I do." Id. On motion of defendants the judge ordered the answer stricken and instructed the jury to disregard the answer. Nevertheless, the irrelevant question was highly prejudicial to Hill and Lowery; the "personal knowledge" of "information" regarding a defendant's narcotics activity is never admissible. No prosecutor should ever ask such a question. The

30

judge's instruction to the witness regarding "personal knowledge" obviously was not meant to refer to information from others; however, that is what the answer reflected. This was not an isolated instance of such questioning.

Michael Hembree testified that he checked certain records relating to Lowery, Hill and other individuals. Despite the ruling just described, Hembree was asked "[w]ere any of these names already familiar to you as a result of your personal investigation?" (20 R. 2690). Once again defendants' objection was sustained, but the question carried its own damaging garbage.

Based upon the large number of instances of similar improper questioning we conclude that the prosecutors intentionally used such questioning as part of their trial strategy. Our conclusion is strengthened by the fact that both prosecutors used the same improper method of questioning. The questions were clearly improper and highly prejudicial to the defendants. Prosecutors have an obligation "to refrain from improper methods calculated to produce a wrongful conviction. . .." *United States v. Murrah*, 888 F.2d 24, 28 (5th Cir. 1989). A breach of that obligation constitutes serious prosecutorial misconduct, the effect of which we discuss later.

E. Comments on Defendants' Failure to Testify

Various appellants challenge five statements by prosecutors,[10] contending that the statements were improper comments upon

---

[10] The challenged comments were made by two different assistant United States Attorneys.

defendants' failure to testify. We conclude that in two instances prosecutors did violate appellants' Fifth Amendment rights.

Prosecutors are prohibited from commenting directly or indirectly on a defendant's failure to testify in a criminal case. *United States v. Montoya-Ortiz*, 7 F.3d 1171, 1178 (5th Cir. 1993). A prosecutor's remarks constitute impermissible comment on a defendant's right not to testify, if the prosecutor's manifest intent was to comment on the defendant's silence or if the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence. *United States v. Collins*, 972 F.2d 1385, 1406 (5th Cir. 1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). A prosecutor's intent is not "manifest" if there is an equally plausible explanation of the prosecutor's remark. *United States v. Collins*, 972 F.2d at 1406. The challenged remarks must be considered in the context of the case in which they are made. *United States v. Montoya-Ortiz*, 7 F.3d at 1179. Some factual background is necessary in order to consider the prosecutors' comments in context.

During closing argument, a defense counsel placed a photograph of a witness for the prosecution in the witness stand and discussed the witness's testimony. During the rebuttal argument the prosecutor removed the photograph from the witness stand, placed it on an easel at the end of the jury box, and surrounded the photograph with pictures of Alvarado, Adams, Felicia Lowery, and Angela Tubbs. Thereafter he stated:

32

But I submit from the testimony you've heard that was, that was, a man chosen by Darrell Adams, mind you, the first relationship. That was a man chosen by Darrell Adams to take care of and take charge of the most precious things in Darrell Adam's everyday life, drugs and money. That was the first choice made. That was the first relationship made.

And to take this Houston Police Department glamour shot of fat addict Roy. Come on. Is that not to some extent misleading? Judging by his appearance. But to set that photograph in that stand without including the other players--

(40 R. 8074). Defendants' objected, and the jury was excused. The district judge ruled that the statement was not a comment on the defendant's failure to testify, but he offered to instruct the jury to disregard the remark. Defendants declined the offer. The prosecutor then continued his rebuttal argument stating:

You cannot be permitted to conclude from this Houston Police Department glamour shot of Roy Patterson -- You cannot, you cannot, be permitted to conclude that he acted alone, that he was not involved in some combination, some confederation, some conspiracy, to possess with intent to distribute cocaine and the reasonably foreseeable consequence of cocaine, crack cocaine, and marijuana. You cannot.

(40 R. 8082-83).

The prosecutor was attempting to persuade the jury that the witness was not acting alone, that he was acting as part of a conspiracy. The prosecutor's argument, although unartful, does not demonstrate manifest intent to comment on the defendants' silence, nor would a jury necessarily construe it as a comment on their failure to testify. The statement was not an improper comment on defendants' failure to testify.

The second comment made during the rebuttal argument is the following:

33

> [Counsel for Lowery] also submitted to you that his
> client has led an open life.  If it's so open, why don't
> you put your automobiles in your name? If it is so open,
> why don't you tell us what you do to make in this cash
> business that you moved to after you've worked at
> Cantonese Grocery. . ..

(40 R. 8099).  Lowery moved for a mistrial.  The motion was denied based on the prosecutor's explanation, outside the presence of the jury, that his comment was directed to Lowery's failure to file income tax returns. The judge then instructed the jury to disregard the statement.

No manifest intent to comment on the defendant's failure to testify is demonstrated in the cited statement.  The prosecutor's explanation, i.e., that he was commenting on the lack of income tax returns, is a plausible explanation for the statement.  Moreover, the jury would not necessarily and naturally view the statement as a comment on Lowery's failure to testify.  The statement did not violate appellants' Fifth Amendment rights.

Appellants also attack a question posed by the prosecutor to IRS Special Agent Jackson. Agent Jackson was asked: "[a]t any time did A.D. Ernest invoke his right to remain silent?"  The agent stated "[h]e did later." (31 R. 6044).  At this point in the trial Ernest was a defendant; later he entered a guilty plea.

The inquiry was restricted to Ernest and did not implicate any appellant.  The jury would not necessarily construe a statement that one defendant invoked his right to remain silent as a comment on the remaining defendants' failure to testify.  Moreover, defendants' failure to contemporaneously object to the question deprived the court of the opportunity to give a curative

34

instruction to eliminate or lessen any prejudice to appellants. The question does not constitute error as to any appellant.

One troublesome comment occurred during the redirect examination of Roosevelt Gatterson. Again, background is essential to place the comment in the proper context. During direct examination Gatterson testified about a number of activities in which he engaged in furtherance of the conspiracy. During cross-examination he was asked three times if anyone could corroborate his testimony concerning three such activities, e.g., cocaine deliveries. Gatterson responded "no" to each of the three questions. On redirect the prosecutor inquired "[a]ren't there some people in this courtroom that can back up what you say?" (15 R. 1165). Simultaneously the prosecutor made a sweeping arm gesture indicating the individuals seated at counsel tables. The judge immediately told the jurors to disregard the impermissible question and instructed them as follows:

> no defendant is required to present any evidence in this case nor to testify in this case. You may not, if any one of them choose not to do so, consider that against them or in your consideration of the evidence at all or in any respect whatsoever.
>
> You've been instructed on that before. You're instructed again. Mr. Dies has asked an improper question in turning as he did toward the defendants in this respect. They are under no burden to make a response on any of that. Therefore, you're instructed to disregard entirely that question.

(15 R. 1166).

The prosecutor demonstrated manifest intent to comment on the defendants' failure to testify. In responding to the cross-examination to the effect that there were no witnesses who could

35

corroborate Gatterson's testimony, the prosecutor implied that there were such people in the courtroom, obviously referring to the defendants. No one else in the court room could have witnessed the events; only the defendants could reasonably be thought to be capable of providing corroboration. The question was bad enough, but the prosecutor made it worse by use of the arm gesture emphasizing that he was referring to the defendants' failure to testify. The prosecutor's question and gesture clearly constituted an impermissible comment on the defendants' silence, serious prosecutorial misconduct.

There is more: during the first portion of the government's closing argument, in highlighting some of the court's instructions on the law that the jury was likely to hear following closing arguments, a prosecutor stated:

> This also says that in an impeachment of prior inconsistencies instruction something that I want to remind you of and the instruction actually reminds you of. It reminds you that a defendant has the right not to testify. That is constitutional right. It is yours. It is mine. It is theirs. Please value it. I do. Don't take into consideration the fact that whether or not anyone testified in this case is inappropriate.

> But what you also can't do in a situation like this is go back into that jury room and make up a story for them. That is impermissible by law. You can't play "what if." You can't say, "Well, if they testified, well, maybe they would have explained this. Maybe they would have said that." That's not allowed and that's fair.

(39 R. 7779-80). Defendants objected to the argument as an impermissible comment on their failure to testify and requested a mistrial. The judge overruled the objection stating "[t]he jury is going to follow the instructions of the court on that." *Id.*

The government urges that there was no manifest intent to comment on the failure to testify, because it is equally plausible that the comment was a plea for the jury to base its verdict solely on the evidence and not on speculation and conjecture, and that the jury would not necessarily have considered the remark as a comment on the defendants' failure to testify. Mindful that wide latitude is accorded counsel during closing argument, we nevertheless deem the prosecutor's statement to be error. The fact that the prosecutor was not attempting to have the jury infer guilt due to the defendant's failure to testify does not render the statement permissible. The statement was a direct comment on the failure to testify. Even though the prosecutor cautioned the jury not to consider whether the defendants testified at trial, his comment focused the jury's attention on the fact that the defendants did not testify. It matters not that the prosecutor was paraphrasing the court's instruction. A statement by the court referring to the defendant's right not to testify is far different from a similar reference by the prosecutor in closing argument; indeed, a defendant who has chosen not to testify probably has the right to request the court to delete such a reference from the court's charge. In any event, the last portion of the prosecutor's statement had no basis in the court's charge and was arguably an incorrect statement of the law. Nothing precludes jurors from theorizing in their own minds as to a defendant's version of the facts in the absence of testimony from the defendant. Our system of justice rigorously guards the right of an accused to remain

37

silent and not to testify.  Prosecutors are obligated never to attempt to sway a jury in any way because of the exercise of an accused of that right.  To suggest that a defendant's decision not to testify somehow limits jurors' mental processes, e.g., with respect to inferences to be drawn from direct evidence, violates that obligation.  The prosecutor's statement constitutes error.

<u>EFFECT OF PROSECUTORIAL MISCONDUCT</u>

Having concluded that the prosecutor's references to the defendants' failure to testify and their improper questioning of various law enforcement officials constitute serious misconduct, we must now determine whether those tactics cast serious doubt upon the correctness of the jury's verdict.  Otherwise, the errors are harmless and do not justify reversal.  *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S.Ct. 1804, 132 L.Ed.2d 265 (1995).

In examining the effect of the prosecutors' impermissible comments, we consider three factors: "the magnitude of the prejudicial effect of the remark, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt."  *United States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir. 1994), *cert. denied sub. nom.*, 513 U.S. 1156, 115 S.Ct. 1113 (1995).

The prejudicial effect of the comment and gesture during Gatterson's testimony was slight.  The question was asked during the second week of a trial that lasted twenty-nine (29) days extending over a period of approximately eight weeks. The prejudice

38

was also lessened because the question was asked during the government's case-in-chief. At that time the jury did not know that the defendants would not testify and would therefore be less inclined to construe the question as a comment on the defendants' silence. The judge's timely and thorough jury instruction further mitigated the effect of that improper comment.

The prosecutor's comment during closing argument was more prejudicial. It was a direct comment on defendants' failure to testify, and it occurred only one day before the jury began deliberations.

The prejudice was mitigated somewhat by the trial judge's instruction prior to the commencement of jury deliberations that:

> The law does not require a defendant to prove his innocence or to produce any evidence at all and no inference whatever may be drawn from the election of a defendant not to testify.
>
> Yesterday morning when [the prosecutor] was giving -- going over some of the instructions, she expected that I would give and remarked on one of these passages and [defense counsel] moved for a mistrial and I denied that and said the jury would follow my instructions. My instructions are these.
>
> Again, no inference whatever may be drawn from the election of a defendant not to testify.

(40 R. 8174). While the harm was mitigated by this jury instruction, the prejudice remained. The constitutional right of a defendant to choose not to testify is a fundamental tenet of our system of justice. The prejudice resulting from a direct reference by a prosecutor to the exercise of that right, coupled with an attempt to use the failure to testify to limit the jurors personal

39

deliberative process cannot be completely cured by a court instruction. The remaining prejudice, especially if cumulated with prejudice resulting from other misconduct, may be sufficient, absent substantial evidence of a defendant's guilt, to cast doubt upon the correctness of the jury's verdict.

As previously stated, the prosecutors' improper questioning of law enforcement officials was highly prejudicial to those appellants directly implicated. There are no factors mitigating that prejudice.

To complete the analysis as to whether the prosecutors' errors justify reversal of convictions, we must measure the prejudice resulting from the misconduct against the strength of the evidence as to each appellant's guilt.

## A. Darrell Adams

There is no need to repeat the extensive evidence already recounted in detail. Suffice it to say that the evidence against Adams is overwhelming. Bosia Cash, Roosevelt Gatterson, Officer Henry King, Kimela Lomax, Stevenson McClendon, Bruce Embrey, and Roy Patterson all identified Adams as the supplier of narcotics being transported to Shreveport for distribution over a lengthy period. There was a great deal of evidence that Adams directed the activities of his co-conspirators in Houston, arranged for the narcotics to be transported to Shreveport, identified the person to whom the drugs were to be delivered, and collected and counted the vast profits derived from these illegal activities.

There is also considerable circumstantial evidence against

40

Adams.  Documents seized from Adams' office at ProCare were identified by FBI Agent Harold Clouse as drug ledgers. Additionally, Adams engaged in various practices common among those involved in narcotics trafficking, including listing pager and telephone service in the name of another. Over a two year period, thirty three (33) different pagers were billed to ProCare.

There is also strong financial evidence of Adams' guilt. Receipts for wire transfers of money were retrieved from his garbage, two for transfers of $4,000 and one for $3,000.  Adams frequently had large amounts of cash in his possession; he made cash payments of $5,000 and $5,341.82 on a Lexus automobile and kept $10,000 in cash in a shoe box in his closet.  The search of Adams' house at the time of his arrest yielded $32,000: $3,000 in a bag in a closet in the master bedroom, $13,000 in a shed, and $19,000 in a bag behind the washing machine.

The financial condition of ProCare also provides evidence of Adams' guilt.  Based on records from the State Comptroller's Office, in 1993 ProCare's reported sales were approximately the same as those established by the records of sales seized at ProCare. However, bank deposits for the business in 1993 were significantly higher.  That surplus is not accounted for by transfers of money from Adams' personal back account to the corporation's account.  After deducting Adams' expenditures from his personal bank account, insufficient funds remained to account for the funds deposited into ProCare's account.  Although Adams purchased Procare in 1991, his income tax return for that year does

not record any income from ProCare. Adams did not file income tax returns in 1992 and 1993. On a credit application for the purchase of a car executed in October 1993, Adams stated that his yearly salary from ProCare was $75,000.

Considering the overwhelming evidence against him, the prosecutorial misconduct does not rise to the level of reversible error as to Adams.

## B.  Gonzalo Alvarado

As with Adams, the evidence against Alvarado is overwhelming. Several witnesses named Alvarado as Adams' source of drugs. Stevenson McClendon testified that he purchased cocaine from Alvarado on behalf of Adams. Gatterson testified that he picked up cocaine destined for Shreveport from Alvarado. Roy Patterson testified that Alvarado personally delivered five kilograms of cocaine to him at the stable used by Adams.

Witnesses saw Adams deliver money to Alvarado, and there was evidence of frequent communication between Adams and Alvarado, including testimony that Alvarado called ProCare daily. When Bosia Cash was arrested and the cocaine he was transporting was seized, Adams sent Gatterson to inform Alvarado of the loss.

During the search of Alvarado's house twelve (12) pounds of marijuana and a five pound scale were seized. A document seized from Adams' office at ProCare, identified as a drug ledger, indicated a payment to Alvarado for cocaine.

Alvarado challenges his convictions based solely on the two comments by prosecutors on the defendants' failure to testify.

42

Considering the overwhelming evidence of Alvarado's guilt we find that the prosecutors' improper comments do not constitute reversible error, and we affirm his convictions.

## C.  Eric Lowery

Considering the strength of the evidence against Lowery we conclude that the prosecutors' misconduct did not have an effect on the outcome of his trial.  Thus, the misconduct was harmless error as to Lowery.

Roy Patterson testified that in approximately May 1993, Lowery and Johnston came to ProCare and Lowery arranged with Patterson to deliver a shipment of marijuana to Shreveport. Roosevelt Gatterson testified that he saw Lowery at ProCare on two occasions; both times Lowery met with Adams. On the second occasion Lowery was accompanied by Johnston.  Gatterson testified that he was told that Lowery and Johnston were at Procare for some type of narcotics deal.

Roy Patterson also testified that large amounts of cocaine and marijuana were delivered directly to Lowery. Patterson testified that Lowery participated in the weighing of one marijuana delivery to Shreveport, and Derrick Patterson corroborated Lowery's involvement in that delivery of marijuana.

Roy Patterson testified that he received large amounts of cash from Lowery and delivered that money to Adams.  Kimela Lomax testified that Johnston delivered a large amount of cash to Adams' house.  Lomax further testified that when Adams confronted Johnston with an accusation that the money Johnston delivered was "short,"

Johnston called Lowery, who discussed the situation with Adams.

There is also strong circumstantial evidence of Lowery's guilt. Lowery phoned and visited Adams at ProCare, and Lowery and Adams met in Shreveport a number of times so that Adams could "take care of business."  Murray Franks, a salesman with EconoPage, testified that he sold several pagers to Lowery during the period covered by the conspiracy.

During the period covered by the conspiracy Lowery purchased a Grand Prix automobile;  he told the car salesman that he did not want to pay more than $10,000 cash for the car.  Lowery paid for the Grand Prix in cash, primarily in denominations of $50 or less. He registered the vehicle in Jennifer Gerard's name.  The vehicle Lowery traded in at the time he purchased the Grand Prix was also registered in Jennifer Gerard's name.

In December 1993, Lowery's brother Walter Gerard used $5,000 cash received from Lowery to pay part of the purchase price of an automobile.  Although the vehicle was registered in Walter Gerard's name and Gerard had a set of keys, it was clear that the car was Lowery's.  Lowery failed to file income tax returns for the years 1991-1993.

### D.   EDWARD JOHNSTON

There is abundant evidence of Johnston's guilt.  Kimela Lomax testified that she witnessed an exchange of drugs and money between Johnston and Adams.  Gatterson testified that Johnston accompanied Lowery to ProCare.  Roy Patterson testified that Johnston appeared at ProCare with Lowery on one occasion and that after Lowery made

arrangements for Roy Patterson to transport thirty (30) pounds of marijuana to Shreveport, Johnston transferred a bag into Patterson's truck. Roy Patterson also testified that Johnston transported marijuana and cocaine for Adams. Johnston accepted delivery of four kilograms of cocaine from Roy Patterson for delivery to Shreveport.

Kimela Lomax testified that Johnston delivered large amounts of cash to Adams on more than one occasion. On one of the occasions Adams informed Johnston that the money was "short;" in response Johnston telephoned Lowery.

Johnston was employed at the City Lights Club owned by Hill. On one occasion Johnston was stopped for a traffic offense shortly after leaving City Lights. He identified the vehicle as belonging to Hill, even though it was registered to Marilyn Timmons. A search of the vehicle revealed $1,802 and two guns which Johnston said belonged to Hill.

Because Johnston was not directly implicated by any of the prosecutor's improper questioning of law enforcement officials, that misconduct was not damaging to him. The prosecutors' comments on the defendants' failure to testify are the sole errors affecting Johnston. Because the evidence of Johnston's guilt is strong, the improper comments are not reversible error.

HILL

Hill joins in the complaints about prosecutorial misconduct; alone among the defendants he claims that in any event the evidence is insufficient to support his conviction. We conclude that had

prosecutorial misconduct not occurred, we would affirm Hill's conviction. But the evidence against Hill is not strong enough to support a conclusion that the prejudice resulting from the prosecutors' misconduct did not substantially affect his right to a fair trial.

The essential elements of a conspiracy under 21 U.S.C. §846 are: (1) an agreement between two or more persons to violate the narcotics laws; (2) a defendant's knowledge of the agreement; and (3) his voluntary participation in that agreement. *United States v. Morris*, 46 F.3d 410 (5th Cir. 1995). Hill concedes that the government established an agreement to violate the drug laws, but contends that the government failed to prove that he was part of the agreement.

In reviewing a claim that there is insufficient evidence to support a conviction, we must determine whether "viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a doubt." *United States v. Morgan*, 117 F.3d 849, 853 (5th Cir. 1997). We are required to "accept all credibility choices that tend to support the jury's verdict." *Id.*, quoting *United States v. Anderson*, 933 F.2d 1261 (5th Cir. 1991).

Applying these tests, we conclude that there is sufficient evidence against Hill to sustain his conviction had serious prosecutorial misconduct not occurred. There is direct evidence of Hill's participation in the conspiracy. Roy Patterson and Derrick

46

Patterson testified that Hill participated in one delivery of thirty (30) pounds of marijuana. The Pattersons testified that Hill led the Pattersons and Lowery to Jennifer Gerard's house, unlocked the door to the house and helped weigh the marijuana.

There is also circumstantial evidence of Hill's guilt. Hill owned the City Lights Club which Lowery managed. Hill referred to Lowery as his partner. As already discussed, the evidence as to Lowery's participation in the conspiracy is overwhelming. Appellant Johnston, Jennifer Gerard, and Walter Gerard all worked at City Lights at times during the period of the conspiracy. Jennifer and Walter Gerard were paid in cash.

On December 10, 1993, Johnston was stopped a short distance from the City Lights Club driving a truck registered to Marilyn Timmons but identified by Johnston as belonging to Hill. A large sum of cash ($1,802) was found in the truck; Johnston stated that the money belonged to Hill. The search of the vehicle uncovered a picture of Hill, Lowery, Adams, Derrick Patterson, and two other men, taken at City Lights. On the same night that the photograph was taken, Derrick Patterson rode with Lowery and Adams to the City Lights Club. Patterson heard Adams ask Lowery about the quality of the marijuana. Lowery told Adams that he would have to ask Hill because Lowery "didn't mess with it." (27 R. 4753).

Ronnie Holden, a friend of Hill, acquired a pager for Hill, and submitted the bills for the pager to him for payment. Dexter Edwards, an account executive for Cellular One testified that Hill purchased a cellular telephone from Cellular One and that

47

cellular phone service established in the names of Marilyn Timmons and Debra Hall was used by Hill. Records of that cellular service indicate that calls were made to ProCare in June and September of 1993.

When Hill was arrested, he asked an unidentified individual to contact "Eric" and "[g]et me some lawyers." (20 r. 2776-78). Two voided ProCare checks named "Larry Hill" as the payee.  Hill did not file an income tax return for 1992 or 1993.  Although Hill owned City Lights for a portion of 1991, his income tax return for that year does not indicate any income from the club.

Although the evidence of Hill's participation in the conspiracy is limited, "a rational jury could have found that the evidence establishes guilt beyond a reasonable doubt." *United States v. Salazar*, 958 F.2d 1285, 1290-1291 (5th Cir.), *cert. denied*, 506 U.S. 863, 113 S.Ct. 185, 121 L.Ed.2d 129 (1992).

The evidence against Hill is far less compelling than that against the other defendants, in part because it is largely circumstantial.  The testimony of the Pattersons is the only evidence that directly links Hill to illegal narcotics trafficking, and that testimony involved only one instance out of many months of narcotics activity by other defendants.  The only other evidence against Hill is weak circumstantial evidence.  Thus, the prejudice resulting from the prosecutors' improper questioning and the improper comments is more likely to have denied him his right to a fair trial.

The jury heard a law enforcement officer testify that as a

48

result of information supplied by others he identified Hill as the focus of the investigation. Such testimony coming from a source generally viewed as highly credible is extremely prejudicial. The jury also heard two improper references to the fact that Hill did not testify at his trial. Weighing the evidence of Hill's guilt against the extreme prejudice he suffered due to the prosecutors' misconduct, we conclude that the cumulative effect of the errors substantially affected Hill's right to a fair trial. Accordingly, we reverse his conviction and remand for a new trial.[11] We are very reluctant to set aside a jury verdict rendered after a long, expensive, contentious trial, at which the district judge performed a creditable job of managing overzealous counsel. Nevertheless, somewhere we must draw the line and send a message to prosecutors that the Constitution governs their actions at trial. This is such a case.

SENTENCING ISSUES

Edward Johnston and Eric Lowery appeal their sentences. They each assert that their base offense level was improperly calculated. Johnston also contends that his criminal history category was not properly computed, and that the district judge erred in stating during the sentencing that he did not have the authority to depart from the Sentencing Guidelines.

Conversion of $90,000 to Cocaine Quantity

We apply the clearly erroneous standard of review to the

---

[11] Because we reverse Hill's conviction we do not address his contention that his sentence was improperly calculated.

49

district court's factual determination regarding the quantity of drugs used to establish the base offense level. *United States v. Morris*, 46 F.3d 410, 419 (5th Cir.), *cert. denied*, _____ U.S. ____ 115 S.Ct. 2595 (1995). A factual finding is not clearly erroneous if it is plausible in light of the record as a whole. *Id.* A preponderance of the evidence must support the district court's determination. *United States v. Ruiz*, 43 F.3d 985, 989 (5th Cir. 1995).

The base offense level under the Sentencing Guidelines is determined in part by the amount of drugs involved. Both Johnston and Lowery claim that the district court erred in converting $90,000 in cash delivered by Johnston to Adams into five kilograms of cocaine for the purpose of determining their base offense levels. They contend that there is no evidence that the cash represented proceeds of cocaine transactions.

Kimela Lomax testified that when Johnston delivered the money, Adams complained that the money was short. There is evidence that when Johnston called Lowery to discuss the shortage, Adams spoke to Lowery and told him that he would be "minus one." Lomax testified that "minus one" meant one "kilo." It is reasonable to infer that "minus one" was a reference to a kilogram of cocaine. Additionally, there is evidence that $18,000 is a reasonable price for a kilogram of cocaine.

Although there is evidence that Lowery and Johnston were involved in trafficking marijuana as well as cocaine, there is no evidence of a single marijuana shipment large enough to account for

50

proceeds of $90,000. However, there is considerable evidence of cocaine shipments equalling or exceeding five kilograms. The district judge's conversion of the $90,000 into five kilograms of cocaine was not erroneous.

Johnston also contends that his criminal history category was improperly computed. Johnston was assessed three criminal history points: one for driving under suspension and two because the conviction involved in this appeal occurred while Johnston was on probation for driving under suspension. Because Johnston had more than one criminal history point he did not qualify for the "safety valve" provision in §5C1.2 of the Sentencing Guidelines.

Johnston urges two grounds in support of his contention that the district court committed error in calculating his criminal history category: the driving under suspension charge was not timely disclosed, thereby rendering it impossible for his attorney to investigate the charge, and the government failed to prove the driving under suspension offense by a preponderance of the evidence.

Although the driving under suspension charge appeared in the Presentence Investigation Report, detailed information concerning the charge and a copy of the documents supporting that charge were not provided to defense counsel until the addendum to the report was filed on the morning of sentencing. Nevertheless, the claim that the untimely disclosure prohibited counsel from investigating the charge is without merit. Johnston's counsel was given time at the sentencing hearing to review the addendum. Thereafter he

indicated that he was ready to proceed with the sentencing. Had counsel desired or required additional time to investigate the validity of the driving under suspension charge, he should have advised the court of that need.  Considering counsel's statement that he was ready to proceed with the sentencing, defendant cannot now claim that he had insufficient time to investigate the charge.

Johnston's contention that the government failed to establish the driving under suspension offense by a preponderance of the evidence is also without merit.  The district judge examined the record of the offense and determined that there was a valid conviction.  There is no evidence to the contrary.

Johnston also contends that his sentence should be vacated because the district judge mistakenly believed that he did not have the authority to depart below the guidelines range.  In support of his contention, defendant relies on the following comments by the district judge:

> the United States laws control this matter, including the guidelines that are prescribed by the United States Sentencing Commission, and a court is required by law to sentence within the guideline range.  The defendant, having been convicted by the findings of a jury, leads then to the requirement that the judge impose a sentence as prescribed by law.  It's not within the power of the judge to impose or not to sentence or to let one off or to let one proceed without having a sentence within the guideline range prescribed by federal law.

(46 R. 32)  The comments were made in response to Johnston's mother's request that her son be allowed to go home with her.  The comments are a reasonable explanation of why her request could not be granted.  The experienced district judge surely was aware of his power to depart downward from guidelines; indeed he did so in

52

assigning Johnston a criminal history category of I.[12]

## ADAMS' 18 U.S.C. §924(c) CONVICTION

Adams was convicted on count 15 of the superseding indictment, which charged that he "did knowingly and unlawfully aid, abet, and assist others, known and unknown to the Grand Jury, to use and carry a firearm during and in relation to a drug trafficking crime" in violation of 18 U.S.C. §924(c)(1)." Based on *Bailey v. United States*, ____ U.S. ____, 116 S.Ct. 501, 508 (1995), Adams contends that his conviction on that count must be reversed.

Adams admits that there is evidence that he aided and abetted Roosevelt Gatterson in "carrying" a weapon in violation of 18 U.S.C. §924(c). However, Adams contends that because the jury was improperly instructed as to the meaning of "use" as construed in *Bailey*, there is no way to determine whether the conviction was based on "use" or "carry", and therefore his conviction must be reversed. The government concedes that there is insufficient evidence of "use" as construed in *Bailey* to uphold Adams' conviction and that the conviction must be reversed and the case remanded for a trial on the "carrying" theory only. *See United States v. Fike*, 82 F.3d 1315, 1328 (5th Cir.) *cert. denied sub. nom*, ___ U.S. ____, 117 S.Ct. 241 (1996).

## CONCLUSION

For the reasons stated, we affirm the conviction of Gonzalo Alvarado and the convictions and sentences of Edward Johnston and

---

[12] The district judge concluded that a criminal history category of II overrepresented the seriousness of Johnston's criminal history.

Eric Lowery.   We also affirm the convictions of Darrell Adams except as to his conviction on count 15, which is reversed and remanded for trial on the charge of "carrying" a firearm in relation to a drug trafficking crime.  We reverse the conviction of Larry Hill on count 1 and remand for a new trial.

ENDRECORD

KING, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the judgment of the panel reversing the conviction of Larry Hill on Count 1 of the indictment. Judge Duplantier's opinion does a careful job of outlining the substantial evidence against Hill. In my view, the prosecutorial misconduct that occurred here does not cast serious doubt on the correctness of the jury's verdict. I would affirm his conviction. In all other respects, I concur in the panel's judgment and in Judge Duplantier's superb opinion.