UNITED STATES of America,
Appellant–Cross–Appellee,

v.

Joseph P. THORN, Defendant–
Appellee–Cross–Appellant.

Docket Nos. 01–1669, 02–1046.

United States Court of Appeals,
Second Circuit.

Argued: Nov. 5, 2002.

Decided: Jan. 09, 2003.

Craig A. Benedict, Assistant United States Attorney, Northern District of New York, Syracuse, N.Y. (Joseph A. Pavone, United States Attorney; Thomas L. Sansonetti, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, of counsel), for Appellant–Cross–Appellee United States of America.

L. John Van Norden, Sciocchetti & Saccocio, PLLC, Schenectady, NY, for Defendant–Appellee–Cross–Appellant Joseph P. Thorn.

Before CARDAMONE, MINER, and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge.

This appeal arises out of the conviction of Joseph P. Thorn ("Thorn") in the United States District Court for the Northern District of New York (Frederick J. Scullin Jr., *Chief Judge* ) of nine counts of violating the Clean Air Act, 42 U.S.C. § 7413(c) (2000), and one count of conspiracy to promote money laundering, 18 U.S.C. § 1956(a)(1)(A), (h) (2000). The government challenges various decisions of the District Court imposing the defendant's sentence, and the defendant cross appeals the District Court's denial of his Rule 29 motion for judgment of acquittal seeking dismissal of the money laundering count. For the reasons that follow, we vacate the sentence imposed and remand for resentencing. We affirm the District Court's denial of the defendant's Rule 29 motion.

**Facts and Procedural Background**

Thorn was the owner of A+ Environmental Services, Inc. ("A+"), an asbestos abatement company in upstate New York. After a four-week trial, a jury convicted him of nine counts (Counts One to Nine) of violating the Clean Air Act, 42 U.S.C. § 7413(c), and one count (Count Ten) of conspiracy to launder money, 18 U.S.C. § 1956(a)(1)(A)(i), (h). Subsequent to a sentencing hearing on July 18, 2001, the District Court sentenced Thorn, on October 30, 2001,[1] to a total term of sixty-five months incarceration followed by three years supervised release, forfeiture of $939,079.98, and restitution of $299,593.40.

Various state and federal laws apply to the removal of asbestos to protect workers, the public, and the environment. *See generally* 29 C.F.R. § 1926.1101 (2002); 40 C.F.R. §§ 61.141, 61.145, 61.150, 61.154 (2002); N.Y. Comp.Codes R. & Regs. tit. 12, § 56 (2001). For example, operators of removal projects involving at least 260 linear feet or 160 square feet of regulated asbestos-containing material must notify government authorities prior to commencing the work so that these agencies can monitor for compliance with the law. *See* 40 C.F.R. § 61.145(a)(1)(i), (b). Workers must construct containment areas and set up negative air ventilation and filtration systems at the work site, precautions that are to remain in place until laboratory analysis confirms that the asbestos has been appropriately removed. *See* 29 C.F.R. § 1926.1101(f)-(g). During removal operations, workers are required to wet the asbestos with amended water[2] to pre-

---

**1.** Thus, all citations will be to the 2000 United States Sentencing Guidelines, unless otherwise indicated. *See* 18 U.S.C. § 3553(a)(4)(A) (2000) (directing the sentencing court to consider, as a factor in imposing sentence, the sentencing range established for the offense as set forth in the Guidelines in effect on the date the defendant is sentenced).

**2.** "Amended water means water to which surfactant (wetting agent) has been added to increase the ability of the liquid to penetrate [asbestos-containing material]." 29 C.F.R. § 1926.1101(b).

vent the release of asbestos fibers into the air and to wear respirators and protective clothing to protect themselves. *See id.* § 1926.1101(g)-(i). Workers also must go through a decontamination unit before they are permitted to leave the containment area. *See id.* § 1926.1101(j)(1)(i). Removed asbestos must be kept wet, appropriately sealed, and transported to landfills specifically licensed to dispose of asbestos. *See* 40 C.F.R. §§ 61.145(c)(6)(i), 61.150. Accredited laboratories collect and analyze samples of the air before, during, and after the project and monitor worker exposure during the project. *See* 29 C.F.R. § 1926.1101(f).

The government presented the following evidence at the trial and sentencing hearing.[3] A+ employed approximately 700 people on abatement projects from approximately 1990 to 1999; the average time spent on friable[4] asbestos projects by these workers was fifty to sixty percent; thirty to forty percent of these workers did not use respirators; ninety percent of these workers smoked cigarettes; and the core group of A+'s workers worked an average of two to five years, and some worked up to eight years.

The government argues that from 1990 to 1999, Thorn directed his workers to violate the rules and regulations governing the removal of asbestos at in excess of 1,100 separate facilities, including commercial, public, and private buildings. Specifically, while the indictment focused on twenty-two particular projects between 1995 and 1999, the government presented evidence both at trial and at the sentencing hearing of at least 108 additional projects (for a total of at least 130 projects

between 1995 and 1999) and over 1,000 private residential projects from 1990 to 1999. Although Thorn assured customers in writing that all abatements would be completed in compliance with the law, the projects often violated many state and federal laws.

The government's evidence depicted Thorn's scheme to defraud as follows. First, he or a supervisor would submit a low bid proposal, which assumed cost savings from illegal shortcuts. Once A+ won the bid, Thorn had his office manager send a contract through the mail, promising full compliance with all applicable laws. Often Thorn directed employees to prepare the required project notification for the file but not to send it to the relevant regulatory agencies (so that in case of discovery, he would feign clerical error), thus decreasing the chance of a regulatory inspection. Thorn then directed workers to perform "rip-and-run" or "rip and skip" abatements, meaning that workers quickly ripped asbestos from pipes with little or no containment, resulting in the release of significant quantities of asbestos fibers into both the work area and other areas of the building. A+'s failure to use required negative air pressure and filtration systems at the abatement sites exacerbated the harm from such rip-and-run practices.

Thorn engaged purportedly independent laboratories and air monitoring companies as crucial elements of the scheme. These laboratories assisted him in falsifying "final air clearances" (which represented that the asbestos had been completely removed from each site) and "OSHA personals" (which reported that worker exposure levels had been below OSHA maximums).

---

**3.** The defendant on appeal acknowledges that the government's summary of the trial and hearing evidence is "consistent with the record."

**4.** "Friable asbestos material means any material containing more than 1 percent asbestos ... that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure." 40 C.F.R. § 61.141.

A+ falsified respirator fit test results and maintained a computer file labeled "Fraud" to generate falsified reports stating that workers had received required medical clearances. These false reports, as part of project close-out packages, were then sent by A+ through the United States mail to reassure customers that the abatements had been successfully completed in full compliance with the law.

Upon receipt of these packages and assurances, clients then, without knowledge of the violations, paid A+ for its services. Thorn testified that his business "grew almost geometrically each year." Office manager Dawn Dayter testified that the funds obtained from illegal projects were used to "finance the next project" as well as to pay office expenses. Craig Ingalls, a former A+ employee, similarly explained that "the money obtained from illegal projects was used to continue and expand the business and perform additional illegal work."

There was testimony that visible emissions of asbestos fibers were released into the air during many if not all projects, and several projects, as a result of the violations, resembled an indoor "snow storm" or "blizzard" due to the large amounts of asbestos in the air. Further, despite regulations requiring Thorn, as owner, to ensure his workers' compliance with the aforementioned rules, *see, e.g.*, 29 C.F.R. § 1926.1001(e)(5) ("The employer shall ensure that employees do not eat, drink, smoke, chew tobacco or gum, or apply cosmetics in the regulated areas"); *id.* § 1926.1001(h) (requiring the employer to provide particular respirators to employees); *id.* § 1926.1001(j) (imposing on employer the duty to insure that employees follow proper decontamination procedures), Thorn did not require his workers to comply with these regulations. In some instances, Thorn failed to supply appropriate replacement filters or sufficient numbers of protective gear for workers who specifically requested these mandated precautions. And Thorn never provided a functioning decontamination unit, as required by law, to enable workers safely and adequately to clean their clothes and bodies before leaving the project sites. The asbestos waste either was sent to landfills dry and without proper bagging, in violation of permits and licenses, or was brought back to A+ where warehouse workers (often very young workers, like the Billetts Brothers, discussed below), without proper protective devices or proper training, were directed to turn the bags inside out (so the labels would not be visible) and simply dump the dry asbestos in trash dumpsters. Those who complained to Thorn about his illegal practices were threatened with being fired and testified that they feared being blackballed from further abatement work.

The government provided detailed exposure evidence for a limited number of the approximately 700 workers employed by Thorn during the scheme. For example, the District Court heard evidence concerning two brothers, Angelo and Jeremy Billetts. Thorn hired Angelo at the age of fourteen to cut A+'s grass and do other maintenance projects, but almost immediately Thorn directed him to cut open and illegally dump bags of friable asbestos into dumpsters. This Angelo did on a daily basis for approximately nine months for about ninety percent of each work day. During this work he became "covered with substantial quantities" of loose friable asbestos. With "visible asbestos all over [his] clothes," he requested a respirator from Thorn; in response, Thorn advised him that he could not have a respirator and that he should clean up the asbestos "and not worry about it." Angelo stated that Thorn supervised and directed all of his work, that there was no decontamina-

tion unit for him to use to clean himself, and that he was not given any protective clothing to use during his work.

Jeremy began working for A+ at age sixteen. He performed warehouse duties on virtually a daily basis for the first two and one-half years of his employment, including cutting open bags of friable asbestos from abatement projects and "dumping the material into dumpsters for disposal as ordinary trash" and cleaning "highly contaminated materials brought back from various asbestos abatement jobs," all at the direction of Thorn. Although this work caused significant quantities of asbestos dust to fly around him, he was never given a respirator. For the next two years of his employment, he worked full-time at A+, generally on asbestos abatement projects, the majority of which work involved illegal rip-and-run removal projects. Occasionally he performed his old warehouse duties, including cutting and dumping bags of friable asbestos without a respirator.

The government also presented evidence from another pair of brothers, Carl and Brian Wolcott. Brian was twenty and Carl was twenty-two when they began working for A+ on abatement projects, and both have smoked cigarettes since the age of sixteen. Both stated that for three years, seventy-five to eighty-five percent of their work was on rip-and-run removal projects of friable asbestos, and that visible emissions "were clearly present, often in heavy concentrations" at every friable asbestos abatement project on which they worked. They further declared that "[w]ell in excess of 99% of the time" they did not wear asbestos respirators and that there was never a decontamination unit available for their use.

Thorn's defense consisted primarily of arguing that A+ was forced to violate the law to stay competitive in the corrupt abatement industry and that the more serious violations were committed against Thorn's direction. Thorn himself testified that he directed certain activities which he knew to be violative of the law, but denied that he permitted dry removals, except in a few isolated projects where dry removal was appropriate, or that he caused false finals to be sent to clients.

Following his conviction, by jury, on all counts of the indictment, Thorn was directed to forfeit the full value of the twenty-two contracts that were the subject of the indictment. The District Court denied Thorn's post-trial motion for judgment of acquittal.

At sentencing, the government presented the expert testimony of Dr. Stephen M. Levin, Medical Director of the Mount Sinai—I.J. Selikoff Center for Occupational and Environmental Medicine and Director of the Selikoff Asbestos Archives and Research Center at the Mount Sinai School of Medicine. He initially provided general testimony regarding asbestos exposure and its risks. Asbestos-related diseases, he stated, appear long after exposure, generally, twenty-five to thirty years from the onset. He explained that "[w]hile there are individual variations in susceptibility to the effects of asbestos (none of which can be predicted in advance), the risks of scarring lung disease (asbestosis and pleural thickening) and cancer are proportional to the dose inhaled into the lung. There is no known dose threshold below which there is no increase in the risk of cancer." Although there are still risks of asbestos-related diseases when workers comply strictly with the Clean Air Act standards because asbestos abatement is a hazardous industry, "workers can be protected better if they're wearing respiratory protection" and if wet methods of removal are used.

Dr. Levin then discussed various epidemiological studies of asbestos workers.

One found that one month of exposure to asbestos nearly doubled the likelihood of dying from an asbestos-related disease. Further, Levin testified that there is a synergistic relationship between the cancer causing agents in smoking products and the cancer causing agents in asbestos such that "one develops [an] extremely higher risk [of developing cancer] for heavy smokers with heavy asbestos exposure." Although he acknowledged that smokers arguably increase their risk of lung cancer through their volitional behavior, Levin testified that "asbestos exposure alone multiplied the risk of lung cancer fivefold."

Dr. Levin reviewed the government's evidence and conducted his own interviews of some workers to ascertain the level of asbestos exposure each experienced as a result of Thorn's Clean Air Act violations. Based on this information, he testified that it was his opinion

> that individuals who work with asbestos in unprotected circumstances under conditions where large concentrations of dust are present in their breathing zone have a very clear risk of developing asbestos-related disease, and under the conditions I have heard described and read in the documents I've been provided, it's my opinion that with virtual certainty among [A+'s] workers there will be asbestos-related disease, scarring lung disease with a very high probability, and also it's my view that there is a very high likelihood that among these workers lung cancer and mesothelioma is [sic] likely to occur.

The government then asked Dr. Levin to focus on a subset of Thorn's workers who

had worked without respirators on friable asbestos projects with visible emissions for between two and four years. Levin said that "[i]t would still be [his] view that . . . there is still very high likelihood that among them significant asbestos-related disease would occur and representing [sic] serious bodily harm and even the possibility of death."

Specifically with reference to Angelo Billetts, Levin concluded that if Angelo had been exposed to asbestos as Angelo had described for even one-third of each work day (and not the great majority of his work day, as Angelo had stated), "the likelihood that he will escape developing asbestos-related scarring lung disease with impairment of lung function I think is virtually nil." With respect to Jeremy Billetts, who informed Levin that he had worked at A+ for a longer period of time than Angelo but had done the dry bag dumping for somewhat smaller percentages of each work day, Levin testified that Jeremy has "a very high risk of substantial bodily injury, and that it's very likely that he will develop scarring lung disease on the basis of that period of exposure under those conditions." [5] Levin believed Jeremy's risk of developing scarring lung disease was even greater than Angelo's because he had been exposed to the illegal abatement and dumping procedures for a longer period of time.

On cross examination, Levin answered the following questions in the affirmative: "Can you say, based upon the information that's been provided to you and the testimony you heard . . . with a reasonable degree of medical certainty that any [A+]

---

**5.** Relevant to the government's evidence concerning the Billetts brothers' exposure at young ages, Levin testified that the risk of developing mesothelioma "increases with the fourth power of time. . . . [T]hat means that the longer one has life ahead of one, the greater [the] risk as time goes on. And for young children, especially, we worry very much about their exposure. . . . We're talking about a 14–year–old, we worry about their exposure more than we do, let's say, 25–year–olds."

Environmental worker was exposed to concentrations of asbestos for a duration that is with a reasonable degree of medical certainty going to result in asbestos-related disease?" and "Virtually impossible to avoid that?" He explained his "yes" answer by referring to the evidence of exposure before the Court:

> [G]iven the circumstances I have heard described and I have read in the transcript of testimony, when there are clouds of visible dust after the disturbance of asbestos-containing insulation, ... in clouds of visible dust as has been described here, working for six months a year or currently without respiratory protection is so likely to produce asbestos-related scarring 25 years later, that if the test of within reasonable medical certainty is only 51 percent likelihood, I can say that without question. I think the likelihood is far greater than that.

He acknowledged that exposure to asbestos visible dust clouds three or four times in one year without respiratory protection "might not be enough for [him] to feel within a medical certainty that [an] individual is going to develop the disease." But he explained that the information workers such as the Billetts and Wolcott brothers had given him suggested much greater exposure, such as routine failure to use respiratory protection for sustained periods of employment ranging from several months to multiple years. Thus, he stated that among those workers who routinely did not use respiratory protection, "there are surely some who are going to develop asbestos-related disease, whether it's scarring or cancer." Thorn did not call any witnesses or submit any evidence to rebut the government's expert.

The Probation Department recommended that the District Court find a total offense level of thirty-seven and a Criminal History Category of II, for a minimum Guideline sentence of 235 months of imprisonment. The District Court, however, imposed sentence of sixty-five months. With respect to the nine Clean Air Act counts, the District Court did not apply a nine-level enhancement pursuant to United States Sentencing Guidelines § 2Q1.2(b)(2) for offenses creating a "substantial likelihood of death or serious bodily injury" or a two-level enhancement pursuant to § 3B1.3 for abuse of a position of trust. Although the District Court's offense level determination for the Clean Air Act counts, combined with Criminal History Category I, yielded a Guideline's range of sixty-three to seventy-eight months, the District Court imposed concurrent sentences of sixty months for each count. To determine the base offense level on the money laundering count, the Court excluded $1,454,486.50—$454,486.50 representing funds generated by the 108 abatement projects that were not the focus of trial and $1 million representing funds generated by the approximately 1,000 residential projects. Again, the Court declined to apply the two-level enhancement for abuse of a position of trust to the money laundering count. Finally, the District Judge granted a downward departure on the ground that Thorn's money laundering offense was atypical, and departed from Criminal History Category II to I, reasoning that II overrepresented the seriousness of Thorn's criminal history. Thus, the Court imposed a sixty-five month term for the money laundering conviction to run concurrently with the sixty month term imposed for the Clean Air Act violations.

On appeal, the government argues that the District Court (i) clearly erred by finding that the Clean Air Act violations did not result in a substantial likelihood of death or serious bodily injury; (ii) erred in refusing to impose an enhancement for abuse of a position of trust; (iii) erred in excluding approximately $1.45 million from

the calculation of the money laundering Guideline offense level; (iv) abused its discretion in granting a downward departure on the ground that the money laundering conviction was outside of the heartland; and (v) abused its discretion in granting a downward departure from Criminal History Category II to I. The defendant argues in his cross appeal that the District Court erred in denying defendants' Rule 29 motion for judgment of acquittal dismissing the money laundering count.

### Analysis

#### I. *Calculation of Thorn's Offense Level*

 Facts relied on in sentencing need be established by a preponderance of the evidence and will be overturned only if they are clearly erroneous. *United States v. Jacobo,* 934 F.2d 411, 418 (2d Cir.1991). We apply *de novo* review to legal questions regarding application of the Sentencing Guidelines. *United States v. Barrett,* 178 F.3d 643, 645 (2d Cir.1999).

#### A. *Substantial Likelihood of Death or Serious Bodily Injury*

██ Sentencing Guideline § 2Q1.2(b)(2) directs a district court to increase the base offense level for a Clean Air Act violation by nine levels "[i]f the offense resulted in a substantial likelihood of death or serious bodily injury." U.S. SENTENCING GUIDELINES MANUAL § 2Q1.2(b)(2) (2000). Application note 1(i) to § 1B1.1 (which was denominated application note 1(j) at the time of Thorn's sentencing) defines serious bodily injury as "injury involving extreme

physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S. SENTENCING GUIDELINES MANUAL § 1B1.1, cmt. n. 1(i) (2002). Neither the Guidelines nor case law define "substantial likelihood"; we adopt the meaning given to this language in the preliminary injunction context, namely, that substantial likelihood means considerably more likely. *See Abdul Wali v. Coughlin,* 754 F.2d 1015, 1026 (2d Cir. 1985) (holding that parties seeking a preliminary injunction that would grant the movant substantially all the relief he ultimately seeks and not merely maintain the status quo "must show a substantial likelihood of success on the merits, *i.e.,* that their cause is considerably more likely to succeed than fail"), *overruled on other grounds, O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).[6]

██ Thus, the District Court should have applied the nine-level enhancement under § 2Q1.2(b)(2) if Thorn's Clean Air Act violations made it considerably more likely that a person would develop an injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty, or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. To trigger the enhancement, death or serious bodily injury need not result from the offense conduct; in fact,

---

6. The Commentary to § 2Q1.2 states that:
 Subsection (b)(2) applies to offenses where the public health is seriously endangered. Depending upon the nature of the risk created and the number of people placed at risk, a departure of up to three levels upward or downward may be warranted. If death or serious bodily injury results, a departure would be called for.

U.S. SENTENCING GUIDELINES MANUAL § 2Q1.2, cmt. n. 6 (2000). The Commentary further explains that this enhancement assumes knowing conduct such that courts might consider a downward departure in cases involving negligent conduct. *Id.* § 2Q1.2, cmt. n. 4.

such actual death or serious bodily injury could warrant an upward departure under the Guideline. *See* U.S. Sentencing Guidelines Manual § 2Q1.2, cmt. n. 6 (2000).

The District Court found

that there was too much uncertainty in the evidence both in terms of available medical science as well as evidence of exposure in the present case to say that with any degree of certainty any personnel suffered serious bodily injury or death. The people involved here did get involved voluntarily in the underlying criminal conduct, co-conspirators in most instances, they willfully refused to use available safety equipment which could reduce their risk of injury. There's just insufficient evidence to support the conclusion that any illness that might result from exposure to asbestos would cause serious bodily injury, so I'm not going to enhance it. . . .

We respectfully disagree and think the District Court's ruling involved two errors of law. First, that the evidence may not have established with any certainty that A+ workers actually "suffered serious bodily injury or death," in the District Judge's words, is not germane to our analysis. The nine-level enhancement applies when the offense resulted in a substantial likelihood of death or serious bodily injury and not only when the offense actually caused such illness or death.

■ Second, it is not relevant under § 2Q1.2(b)(2) that some of Thorn's workers may have been co-conspirators. As the government argues, the Sentencing Commission knows how to limit an enhancement based on the creation of substantial risk of death or serious bodily

injury to the victims of an offense and not to permit an enhancement when those put at risk were co-conspirators. For example, § 2K1.4(a)(1) directs district courts to apply a greater base offense level when the offense "created a substantial risk of death or serious bodily injury to any person other than a participant in the offense." U.S. Sentencing Guidelines Manual § 2K1.4(a)(1) (2000). Section 2Q1.2(b)(2) includes no similar restriction on the class of individuals put at substantial risk by the offense conduct, and we decline to read such a limitation into the Guideline. Thus, we find that § 2Q1.2(b)(2) is not limited to situations in which the offense conduct created a substantial risk of death or serious bodily injury to persons other than participants in the offense.

■ To the extent the District Court found that the evidence was too uncertain to support a finding that Thorn's conduct resulted in a substantial likelihood of death or serious bodily injury, we find that this factual finding constituted clear error.[7] The facts relevant to this enhancement are admittedly complicated because A+'s workers already were at some risk of developing these injuries as a result of their decision to work in a field that is dangerous even when all precautions are taken. Further, many of these workers were at risk of contracting some of these diseases, such as lung cancer, as a result of their decision to smoke, and some increased their exposure to asbestos by choosing not to wear respirators. The District Court seemed to take this volitional behavior into account when it noted that the "people involved" were involved voluntarily and

7. We find it beyond peradventure that asbestos-related diseases, such as mesothelioma, asbestosis, and lung cancer, constitute serious bodily injury under the Guidelines. Thus, our analysis will focus on whether the defendant's actions resulted in a substantial likelihood of inflicting one or more of these injuries on one or more individuals.

"willfully refused to use available safety equipment."

That some workers smoked[8] or failed to wear protective gear did not absolve Thorn of his duty, under the law, to comply with federal laws, including his obligation as an employer not to permit violations of safety regulations. Evidence shows that Thorn did not direct his workers to wear respirators. More importantly, in some instances, Thorn failed to provide respirators, replacement filters, sufficient quantities of protective gear, and decontamination units, despite specific requests from workers for these mandated protections.

We acknowledge that asbestos abatement is a dangerous profession that places workers at risk of developing asbestos-related diseases even when they and their employers comply fully with the law. But that asbestos abatement inherently imposes risks on its workers does not preclude a finding that Thorn's illegal behavior resulted in a substantial likelihood (as opposed to some undefined possibility based on the general dangers of the industry) of death or serious bodily injury to these workers.

We find that there is clear, undisputed testimony in the record that at least some of A+'s workers were considerably more likely, as a result of Thorn's Clean Air Act violations, to develop asbestos-related disease than if they had performed abatement under lawful conditions. Dr. Levin testified, based on the evidence in the record of many workers' sustained, routine exposure to visible emissions without respiratory protection, that among A+'s workers there will be asbestos-related disease with virtual certainty. Moreover, he offered unequivocal and unrefuted testimony concerning the Billetts brothers' exposure to asbestos as a result of Thorn's conduct.

That is, as noted earlier, even assuming one-third less exposure to asbestos than Angelo had claimed in his testimony, Levin opined that there was virtually no chance that Angelo would escape developing asbestos-related scarring lung disease with impairment of lung function.

Thus, given the absence of an articulated reason to reject this undisputed evidence, it was clear error for the District Court to find that there was insufficient evidence that Thorn's conduct resulted in a substantial likelihood that at least one, if not several, of his former employees would develop devastating, life-threatening, asbestos-related diseases.

### B. *Abuse of a Position of Trust*

■ Guideline § 3B1.3 directs sentencing courts to increase the base offense level by two levels

[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.... This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S. SENTENCING GUIDELINES MANUAL § 3B1.3 (2000). Application note one explains that

"[p]ublic or private trust" refers to a position of public or private trust char-

---

8. Although the government's expert acknowledged the synergistic relationship between smoking and exposure to asbestos, he also testified that asbestos exposure alone multiplied the risk of lung cancer fivefold. *See supra.*

acterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. The adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

*Id.* § 3B1.3, cmt. n. 1. Further, note three defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *Id.* § 3B1.3, cmt. n. 3.

We have held that "[w]hether a position is one of 'trust' ... is to be viewed from the perspective of the offense victims and is a question of law for the court, subject to *de novo* review on appeal." *United States v. Wright,* 160 F.3d 905, 910 (2d Cir.1998) (internal citations omitted). A court's determination that an individual "abused [a] position [of trust] in a manner that significantly facilitated the commission or concealment of the offense is a question of fact reviewed for clear error." *United States v. Hirsch,* 239 F.3d 221, 227 (2d Cir.2001).

■ Whether someone occupies a position of trust "turns on 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong,'" *United States v. Allen,* 201 F.3d 163, 166 (2d Cir.2000) (per curiam) (quoting *United States v. Viola,* 35 F.3d 37, 45 (2d Cir. 1994), *cert. denied,* 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995)), and does not require "a legally defined duty such as fiduciary duty," *United States v. Barrett,* 178 F.3d 643, 646 (2d Cir.1999). We recently explained that this standard requires that the "defendant's position must involve discretionary authority ... [and that] this discretion must have been entrusted to the defendant by the victim." *Hirsch,* 239 F.3d at 227. "One who merely engages in arms-length dealings in a commercial transaction does not thereby occupy a position of trust." *Wright,* 160 F.3d at 910; *see also Hirsch,* 239 F.3d at 227–28 (finding defendant held a position of trust because he "was a broker and investment advisor entrusted with investment discretion by his investors and because he had a fiduciary and personal relationship (rather than an arms-length relationship) with his investors").

■ The District Court did not add two levels to Thorn's base offense level for abuse of a position of trust, reasoning that "we just addressed that enhancement when we gave him an enhancement for his role as owner of the corporation, organizing the activity. The particular abuse of trust, he was given the activity because of his ability to do that type of work ...—the adjustment is based solely upon [his] use of a special skill, you can't use that to enhance him again. You made an adjustment under 3B1.1." In other words, the District Court concluded that it could not enhance Thorn's sentence under § 3B1.3 for using a special skill because it had

applied an aggravating role enhancement. *See* U.S. SENTENCING GUIDELINES MANUAL § 3B1.3 (2000) ("[I]f this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)."). The question for us is whether the District Court erred in failing to impose the enhancement because Thorn abused a position of trust and did not merely use a special skill.

In arguing that the District Court erred in failing to enhance both the Clean Air Act and money laundering counts based on Thorn's abuse of a position of trust, the government cites to evidence in the record that Thorn enjoyed considerable discretion, due to the nature of his work, to perform illegal abatements and carry out his scheme undetected for ten years. Regulations prevented clients from being present, absent required safety gear and training, to oversee A+'s work and to confirm that A+ was complying with all state and federal laws. Clients were forced, by these circumstances, to trust that Thorn's certifications were truthful. Thorn, the government continues, then took advantage of his discretion, by, *inter alia*, instructing his workers to cover windows and block entryways to prevent customers from overseeing the abatements.

The defendant argues, in response, that Thorn's conduct was not akin to any of the examples provided in § 3B1.3's application notes. Rather, "Thorn's position as a licensed abatement contractor did not aid him in avoiding the detection of his convicted offenses ... because of the substantial regulation of the asbestos industry."

As a contractor hired to abate his customer's asbestos, Thorn was responsible for complying with the terms of his contract, which included compliance with state and federal laws. It does not appear from the record before us that he had a close personal relationship with his clients, *see Hirsch*, 239 F.3d at 227–28 (distinguishing cases in which defendants had personal or fiduciary relationships with victims from those in which defendants and victims had arms-length contractual relationships), or that he was responsible for their well-being, *see Wright*, 160 F.3d at 910–11 (noting that a defendant "who is a fiduciary or one who is responsible for the well-being of a victim of his crime, and as such is given discretion over spending and is thereby afforded an opportunity, not generally available, to embezzle moneys, does occupy ... a position [of trust]"). Nor, possibly suggestive of a position of trust, did he have special access to information which he abused, such as when an employee uses a password to print airline tickets for himself, *see United States v. Castagnet*, 936 F.2d 57, 62 (2d Cir.1991), or an employee uses her access to company checks to write checks to her personal account, *see Allen*, 201 F.3d at 166–67. *See also id.* (summarizing Circuit cases).

Thorn having discretion, as the owner of A+, over how A+ would fulfill its contractual obligations to its clients (which actions the clients always could claim had insufficiently fulfilled the contract obligations), is not the same as A+'s clients *giving* Thorn discretion with respect to how A+ fulfilled its contract obligations. *Cf. United States v. Jolly*, 102 F.3d 46, 48 (2d Cir.1996) (remarking that even if a defendant has " 'professional or managerial discretion' in his capacity as a vice president of his company ... [,] for purposes of Section 3B1.3 the discretion must be entrusted to the defendant by the victim"). Rather, his clients theoretically retained the ability to oversee Thorn's work and ensure his substantial performance of the contract, even if such oversight was more complicated due to regulations restricting access to the site or the regulatory and scientific com-

plexity of the project. For example, they could have demanded that Thorn provide access to or at least remove the garbage bags from the windows at the work sites. Further, the government presented evidence that Thorn sent final air clearances to his clients to reassure them that he had completed the project in compliance with the law. This suggests that Thorn's clients did not blindly trust him but rather expected him to present proof that his work complied with state and federal regulations. That Thorn's illegal activities frustrated his clients' oversight by corrupting various checks on his performance does not mean that he held a position that his victims intended to be immune from oversight and control; indeed, it appears that he held a position with certain checks in place to confirm his compliance with the law and the contract, but that his illegal actions undermined these checks. *Cf. Viola,* 35 F.3d at 45 ("[The defendant] may have abused his position as an employee by surreptitiously viewing the manifests and disclosing their contents, but his position as a forklift operator was not a repository of public or private trust within the meaning of § 3B1.3.").

To the extent the record includes evidence that some of Thorn's clients deferred to Thorn, such deference arguably was due to his special skill as an asbestos contractor, a skill not possessed by members of the general public and that requires substantial education, training, and licensing. *See* U.S. SENTENCING GUIDE-LINES MANUAL § 3B1.3, cmt. n. 3 (2000). It does not appear from the record before us that Thorn's clients deferred to him because of some special relationship of trust or confidence; rather, apparently they deferred to his expertise, as purportedly con-

firmed by independent laboratories and federal and state regulators. Although such deference could warrant a two-point enhancement under § 3B1.3 for use of a special skill, the District Court correctly held that it could not apply that enhancement in this case because it had already applied an aggravating role enhancement under § 3B1.1. *See* U.S. SENTENCING GUIDELINES MANUAL § 3B1.3 (2000).

We do not rule, however, that the position of asbestos abatement contractor as a matter of law is not a position of trust under § 3B1.3. As we concluded in *United States v. Laljie,* 184 F.3d 180, 195 (2d Cir.1999), Thorn's occupation "may or may not be imbued with [the] characteristics" of a position of trust, including professional or managerial discretion and lack of supervision. If, for example, a client entrusted Thorn with discretion to complete the abatement project with no supervision and without relying on the independent laboratory's test results or a client had a close personal or fiduciary relationship with Thorn, then conceivably a District Court could find that this particular client had put Thorn in a position with discretionary authority that then provided Thorn the freedom to commit a difficult to detect wrong.

The District Court did not make explicit findings, however, regarding the degree of discretion accorded Thorn by his clients. Thus, we remand this issue to the District Court for specific findings consistent with this opinion, including whether any customers entrusted Thorn with discretion to complete the asbestos projects without supervision and without relying on the independent laboratory test results to confirm compliance with state and federal regulations.[9]

---

**9.** If the District Court were to find that one or more clients did grant such discretion and that this discretion put Thorn in a position of

trust under § 3B1.3, the District Court would then need to make a specific finding whether Thorn used such a position of trust in a man-

## C. *The Money Laundering Guideline*

■ Guideline § 2S1.1(b)(2), as it existed at the time of Thorn's sentencing, instructed the sentencing court to increase the base offense level for money laundering based on the value of the funds laundered. Specifically, subsection (E) directed the sentencing judge to increase the base offense level by four points when the value of the funds exceeded $600,000 but was less than or equal to $1 million, and subsection (G) directed the judge to add six levels when the value of the funds was more than $2 million but less than or equal to $3.5 million. U.S. SENTENCING GUIDELINES MANUAL § 2S1.1(b)(2) (2000). It is appropriate to include relevant conduct, as defined in § 1B1.3, in this calculation. *See generally* U.S. SENTENCING GUIDELINES MANUAL § 1B1.3, cmt. background (2000) ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."). The Background section of the Commentary to § 2S1.1 explained that "[t]he amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise." *Id.* § 2S1.1, cmt. background.

The government maintains that, although its trial proof focused on only twenty-two projects between 1995 and 1999, its evidence at trial and sentencing established that Thorn laundered funds in connection with at least 130 projects (and not merely the twenty-two that dominated the trial proof) during this time period and that Thorn abated at least 1,000 private residences between 1990 and 1999, for an average price of $1,100 per house, as part of the same illegal scheme. The twenty-two projects involved funds valued at just

under $1 million ($939,079.98, the amount set forth in the forfeiture count of Thorn's indictment), and the residential abatements and the 108 other 1995–1999 projects, aggregated, involved funds valued at approximately $1.45 million. Thus, under § 2S1.1(b)(2)(G), the government argues that the District Court should have added six points to the money laundering base offense level of twenty-three because the value of the funds laundered was greater than $2 million.

The defendant raised concerns before the District Court that *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), might require the Court to include only $939,079.98, the funds identified in the indictment as being subject to forfeiture. As the defendant contends on appeal:

> In the context of money laundering, the sentence ultimately imposed is driven by the value of the laundered money. The amount of funds is a constitutionally significant factor which must be plead [sic] in the indictment and submitted to a jury. In the present case, the government pled and the jury found the proceeds of the money laundering conspiracy to be $939,079.98. The government is bound by its indictment and the jury finding.

Directly following the defendant's *Apprendi* argument at sentencing, the District Court stated that it had "some concerns about that as well in light of the facts of this case and the evidence presented, so [it found] that a four-level adjustment is more appropriate than six." Thus, the District Court calculated the money laundering Guideline level by including only the funds involved in the twenty-two projects that were the main focus of the trial and by excluding the approximately

ner that significantly facilitated the commission or concealment of the offense.

$1.45 million for the remaining 108 projects and the 1000 or so private home abatements. As a result, because the District Court calculated the value of the laundered funds to be more than $600,000 but less than $1 million (specifically, $939,079.98), it applied § 2S1.1(b)(2)(E) rather than (G) and thus added four points to Thorn's money laundering base offense level.

As a matter of law,[10] we differ with the District Court to the extent that it agreed with the defendant's argument that *Apprendi* precluded it from including funds derived from uncharged projects. The Supreme Court held in *Apprendi* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. Following defendant's sentence, we concluded "that *Apprendi* does not apply to enhancements that determine a sentence that is within the applicable statutory maximum and that would otherwise be above the applicable statutory minimum." *United States v. Norris*, 281 F.3d 357, 359 (2d Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 2641, 153 L.Ed.2d 820 (2002). Thorn was convicted of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (h). The statutory maximum term of imprisonment for this offense is twenty years. 18 U.S.C. § 1956(a)(1). If the District Court had found, by a preponderance of the evidence, that the value of the laun-

dered funds was over $2 million, as the government maintains it should have done, the bottom of Thorn's Guidelines range would have been below the twenty-year statutory maximum term of imprisonment, and *Apprendi* would have been implicated only if the sentencing judge had imposed a sentence within the new range but greater than the statutory maximum of 240 months.

The defendant acknowledges on appeal that his *Apprendi* argument was rejected by *Norris,* yet he persists in making the argument. We find that the District Court's determination that *Apprendi* prevented it from considering the approximately $1.45 million in calculating Thorn's money laundering offense level was legal error, in light of *Norris.* We remand to the District Court to make factual findings consistent with this opinion regarding whether any of the funds derived from these uncharged projects constitute relevant conduct under § 1B1.3.

## II. *Downward Departures*

A district court "may impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S. SENTENCING GUIDELINES MANUAL § 5K2.0 (2000) (quoting 18 U.S.C. § 3553(b)). The Supreme Court has clarified, however, that

---

10. The District Court's basis for its calculation is not immediately obvious. It is arguably possible to interpret its statement at sentencing, quoted *supra,* as a factual determination, subject to our review for clear error, that, based on the facts and circumstances of this case, the projects totaling $1.45 million did not constitute relevant conduct under § 1B1.3. Given that the District

Court's explanation directly follows defense counsel's *Apprendi* argument and lacks discussion of any reason to reject the voluminous evidence in the record that these uncharged projects were part of the defendant's scheme, however, we find that the District Court made a legal conclusion, as discussed *infra,* and did not make a factual finding.

although a district judge retains some discretion in sentencing under the Guidelines,

> [b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.

*Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *see also United States v. Sentamu,* 212 F.3d 127, 134 (2d Cir.2000) ("Departures from the prescribed Guidelines ranges are allowed only in cases that are unusual.").

In view of the district courts' institutional advantage, the decision of a district court to depart in a particular case is reviewable under an abuse of discretion standard. *Id.* at 135. It is not our role to substitute our judgment for that of a district court as to the appropriateness of the sentence imposed. *United States v. Galante,* 111 F.3d 1029, 1036 (2d Cir.1997). "The test of discretion asks whether the circumstances relied upon to justify a downward departure are so far removed from those found exceptional in existing case law that the sentencing court may be said to be acting outside permissible limits;

then, and only then, should we rule it has misused its discretion." *Id.* However,

> "[t]he abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions. The question of 'whether a factor is a permissible basis for departure under any circumstances is a question of law,' and a 'district court by definition abuses its discretion when it makes an error of law.' ... [T]he district court's decision to depart may be overturned where the factor relied on by the district court, in light of the circumstances, 'is not unusual.' "

*Sentamu,* 212 F.3d at 135 (quoting *Koon,* 518 U.S. at 100, 110, 116 S.Ct. 2035).

Further, as we have recognized,

> Congress has expressed its intent, in no uncertain terms, that when a sentencing court departs from the applicable guideline range, that departure must be justified by *specific* reasons.... [W]hen examining the validity of a departure, we consider only those reasons articulated by the district court; a party's *post hoc* proffer of additional reasons will not cure an unjustified departure.

*United States v. Butler,* 954 F.2d 114, 121 (2d Cir.1992) (citing 18 U.S.C. § 3553(c)(2)) (emphasis in original) (internal citations omitted); *see also United States v. Amaya–Benitez,* 69 F.3d 1243, 1246 (2d Cir.1995) (finding that the district court must state " 'the specific reason for the imposition of a sentence different from that described' by the Guidelines") (quoting 18 U.S.C. § 3553(c)(2) and citing *Butler,* 954 F.2d at 121). "[T]he district court must make clear on the record how the court determined the magnitude of the departure." *United States v. Campbell,* 967 F.2d 20, 26–27 (2d Cir.1992). This requirement is "designed to facilitate appellate review of sentencing decisions."

*United States v. Cervantes,* 878 F.2d 50, 54 (2d Cir.1989).

■ Assuming we find an error of law or a clear error of fact, "we will vacate a sentence and remand for resentencing because of a misapplication of the Guidelines only if we determine that the error was not harmless." *United States v. Tropiano,* 50 F.3d 157, 162 (2d Cir.1995).

### A. *Money Laundering Downward Departure*

■ The District Court granted defendant's motion for a downward departure on the money laundering offense, finding that Thorn's crime was outside the heartland of the money laundering Guideline:

> The heartland of crimes that the money laundering [sic] are intended to encompass are those involving widespread and far-reaching schemes such as those associated with organized crime, racketeering offenses, or serious drug crimes and conspiracies. That is not the situation here.

> The defendant's business, asbestos abatement and removal, was at its core legitimate. Had defendant operated that business in accordance with the regulations governing the asbestos abatement industry, we would not be here today. The thrust of defendant's crime is his violation of those regulations, not engaging in a conspiracy to conduct financial transactions that involved the proceeds of mail fraud with the intent to promote the carrying on of further mail fraud. There is no question that defendant used the money he received through the mail from his customers whom he defrauded by improperly performing asbestos abatement work, and sending them false laboratory test results and assuring that he would not—or he would or had removed the asbestos in compliance with the appropriate state and federal regulations, pay his laborers and staff, office staff, purchase supplies, and finance additional asbestos abatement projects. However, these financial transactions were only tangentially related to the essence of the defendant's crime; his failure to perform asbestos abatement projects in compliance with appropriate state and federal regulations. Nor did the defendant attempt to conceal his fraudulent conduct through the use of these financial transactions.

> The crime here is simply not the type of money laundering fraud that would warrant a 10– to 20–year sentence. To apply the money laundering guideline to this type of violation when the money laundering computations were derived from that guidelines [sic] relationship to drug crimes would produce a custodial range that grossly exaggerates the seriousness of the actual conduct.

> For all of these reasons and the reasons cited by the defendant in his submissions, the Court finds that this case is outside the heartland of the money laundering guideline and therefore will depart downward from the guideline-specified sentence.

Thus, although the Guidelines calculation performed by the Court called for a range of imprisonment between 121 and 151 months, the District Court sentenced Thorn to sixty-five months imprisonment on the money laundering count.

We believe that the District Court made an error of law in granting a heartland departure in this case, to the extent it based its decision on a finding that Thorn's offense was atypical, and thus outside of the heartland, because he did not launder the proceeds of serious crimes like drug trafficking and organized crime. In so doing, we make reference to a ruling of this Circuit, *United States v. McCarthy,* 271

F.3d 387 (2d Cir.2001), which was decided seventeen days after Thorn's sentence was imposed and thus could not have been known to the District Court at the time of Thorn's sentencing. *McCarthy* involved a conviction for, *inter alia,* embezzling from ERISA trust funds and the subsequent laundering of those funds. The defendant sought a downward departure because his conduct was outside of the heartland of typical money laundering conduct. *Id.* at 401. The district court in that case, however, denied the request. On appeal, the defendant argued that the district court erred as a matter of law by not deeming his money laundering activity to be atypical and not sentencing him instead under the embezzlement Guideline, as the Guidelines section most applicable to his conduct. In rejecting this argument, we observed that "the district court correctly found [that the defendant's] conduct did not represent an 'atypical' money laundering case," since the way in which the funds were laundered was critical to the scheme's success. *Id.* at 402. Further, we were not persuaded that the defendant's money laundering conviction was atypical because the laundered funds were not the proceeds of serious crimes like drug trafficking and organized crime, because "we do not believe the money laundering guidelines are limited only to proceeds derived from drugs or organized crime." *Id.; see also United States v. Kayode,* 254 F.3d 204, 216 (D.C.Cir.2001) (stating, in a similar case, that the court was not persuaded that "the money laundering guideline cov-

ers only proceeds from drug or organized crimes" and collecting cases) (cited to with approval in *McCarthy* ), *cert. denied,* 534 U.S. 1147, 122 S.Ct. 1107, 151 L.Ed.2d 1002 (2002).[11]

In addition to our recent statement in *McCarthy* that the money laundering Guideline is not limited only to proceeds derived from drugs or organized crime, we note that the commentary to § 2S1.1 specifically refers to "specified unlawful activity"—a legal term defined at 18 U.S.C. § 1956(c)(7) (2000) (which incorporates crimes itemized in 18 U.S.C. § 1961(1) as well) to include a wide variety of crimes, well beyond drug and organized crimes, such as the destruction of aircraft, prohibited transactions involving nuclear materials, *and* mail fraud (the specified unlawful activity underlying Thorn's money laundering conviction).[12] This suggests that the Sentencing Commission, in writing the Guideline, was aware that Congress had defined specified unlawful activity quite broadly, and, by not stating otherwise, had incorporated this broad definition into the heartland of the Guideline.

Further, § 2S1.1, the Guideline applicable to money laundering offenses, provided, at the time of Thorn's sentencing, for an enhancement to the offense level when drugs were involved in the offense. U.S. SENTENCING GUIDELINES MANUAL § 2S1.1(b)(1) (2000). As the government argues, that the Commission provided for an enhancement when the laundered funds derived from drug activity is further evidence that § 2S1.1's heartland consists of

11. *McCarthy* presented a different question than this case does, namely, whether the district court used the wrong Guideline and not whether the court erred in downwardly departing from the applicable Guideline. But the defendant's argument in *McCarthy* for why the district court had erred was closely related to the issue before us, namely, whether laundering proceeds not derived from seri-

ous crimes like drug trafficking and organized crime constitutes atypical conduct under the money laundering Guideline.

12. The money laundering statutes list nearly 100 "specified unlawful activit[ies]," many of which are unrelated to drugs or organized crime. *See* 18 U.S.C. §§ 1956(c)(7), 1961(1) (2000).

more than just drug crimes. Additionally, this Guideline, at the time of Thorn's sentencing, used the value of the laundered funds to determine the seriousness of the crime and did not use the underlying criminal behavior as the measure of the seriousness of the offense. *See id.* § 2S1.1.[13]

The defendant in fact concedes that the language of the statute "would embrace the conduct for which the defendant was indicted and convicted here," but he asserts that Congress intended the statute, which was enacted as part of the Anti-Drug Abuse Act of 1986, "primarily to combat large amounts of money being laundered by the drug trade and organized crime." In support of this argument, Thorn does not cite any controlling Circuit case law, however, and he fails to address—much less distinguish—*McCarthy*.

In light of the foregoing, that money laundering is not limited only to proceeds

of serious crimes like drug trafficking and organized crime, we remand for consideration by the District Court in accordance with the dictates of *McCarthy*.

### B. *Criminal History Downward Departure*

The government appeals the District Court's decision to grant Thorn a downward departure from Criminal History Category II to I. The Presentence Report ("PSR") recommended a Criminal History Category of II based on Thorn's November 4, 1985 conviction for operating a motor vehicle while intoxicated and his June 10, 1993 conviction for offering to file a false instrument that falsely represented that his business had the required insurance. Although the record suggests that defendant did not expressly move for a downward departure from Criminal History Category II to I,[14] the District Court

---

13. Two days after Thorn's sentence, § 2S1.1 was amended to direct district courts to determine, when possible, the base offense level for money laundering counts by reference to the offense that produced the laundered money. *See* U.S. SENTENCING GUIDELINES MANUAL § 2S1.1 (2001). Because this amendment enacted a substantive change, however, and not a clarification, it does not apply retroactively to Thorn's sentence. *United States v. Moloney*, 287 F.3d 236, 241 n. 2 (2d Cir.), *cert. denied*, —— U.S. ——, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002).

14. The parties' sentencing memoranda and the PSR make no reference to a downward departure from Criminal History Category II to I. Rather, the defendant argued to the District Court that his 1985 driving under the influence conviction should not be included in his Criminal History calculation because even though it was "within ten years from the Indictment ("on or about 1995")—[it] must be excluded because the Indictment is not specific as to the date of commencement within 1995." The government and the Probation Department disagreed, arguing that "[p]ursuant to U.S.S.G. § 4A1.2, comment. (n.8) [sic], the term 'commencement of the instant of-

fense' includes any relevant conduct." Because trial testimony indicated relevant conduct dating back to 1990, the government and Probation reasoned that Thorn's 1985 conviction was well within the ten-year period and thus should be used in calculating Thorn's criminal history score.

Although the second addendum to the PSR indicated that "if the Court finds that the criminal history has been scored properly at Criminal History Category II, [Thorn] intends to argue for a downward departure based on the Adequacy of Criminal History Category (Policy Statement) at U.S.S.G. § 4A1.3 [sic]," the record does not reflect that Thorn ever made a motion to the District Court for a downward departure on this ground. Thorn acknowledges that the record is unclear on this point but asserts that the probation officer orally informed the District Court that the defendant requested a downward adjustment to his criminal history score, based on the "ancient" age of his prior convictions. At sentencing, the District Court merely recognized on the record that Thorn had "brought motions for a downward departure based on several factors, indicated some of them, another factor is the criminal history."

found that Thorn's criminal history was "overrepresented" and was "better represented by Criminal History Category I." It did not make any findings, however, to explain its conclusion that Category II overrepresented the seriousness of Thorn's criminal history. In response, the government asked the Court to confirm that the judge was downwardly departing from II to I, and when the Court responded, "yes," the government said "okay." The government offered no objection to this departure at the time of sentencing.

The government concedes, as it must, that § 4A1.3 provides for a downward departure when a defendant's Criminal History Category significantly overrepresents the seriousness of the particular defendant's criminal history. But it argues that the District Court offered no reasoning to support its conclusion that Category II overrepresented the seriousness of Thorn's criminal history. Further, the government asserts that there is nothing about the defendant's criminal history that would take him outside of the heartland of Category II; rather, that Thorn previously had been cited for civil violations of both OSHA and wage regulations and that his 1993 conviction involved falsified documentation for his business suggested a particularly high risk of recidivism.[15]

The defendant responds that the government had an opportunity at sentencing to object to the District Court's decision to grant a downward departure. Because the government did not object or oppose the District Court's decision, the defendant asserts that the government waived any objection to the departure. He does not cite any case law, however, to support this argument. Alternatively, the defendant argues that the departure was "supported by the credible evidence," considering the age of his previous convictions.

 We conclude that the government did not forfeit[16] its objection to the criminal history departure because it had inadequate notice that the District Court intended to depart on the ground that Thorn's criminal history score significantly overrepresented his criminal past. Before sentence is imposed, the district court must give the government both notice of the court's intention to depart, including the factors that the judge is planning to rely upon, and some brief explanation as to why these factors warrant a departure, and an opportunity to be heard as to why the contemplated departure is unwarranted. *United States v. Jagmohan*, 909 F.2d 61, 63–64 (2d Cir.1990); *see also United States v. Alba*, 933 F.2d 1117, 1120 (2d Cir.1991) (finding that the government had

---

15. The government argues that these civil adjudications in fact could have been grounds for an upward departure pursuant to § 4A1.3(c) (2000) (permitting sentencing court to consider, in deciding whether to upwardly depart on the basis that a defendant's Criminal History Category does not adequately reflect the seriousness of his criminal history, "prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order").

16. Although the defendant asserts that the government has waived its objection to this departure, there is no evidence that the government intentionally relinquished or abandoned a known right. *See United States v.*

*Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (distinguishing "forfeiture" of a claim, which results from failure to assert the claim in a timely fashion, and which does not prevent an appellate court from reviewing the claim for plain error, from "waiver," which is the "intentional relinquishment or abandonment of a known right," and which permanently extinguishes the right to raise the claim). Thus, at best, the defendant has alleged that the government has forfeited its present argument on appeal. Forfeiture results from the failure to assert a claim in a timely fashion, and we review a forfeited claim for plain error. *See id.*

not waived an objection to a departure, even though it had not presented the argument to the court at the time of sentencing, because the government had not received adequate notice of the possibility of departure). As we noted in *Jagmohan,*

> The value of prior notice is manifold. First, it "will alert counsel to the need to present any available challenge to the accuracy of [those] factors [on which the court intends to rely] and to the propriety of their use for a departure." [*United States v.*] *Kim,* 896 F.2d[,678,] 681 [(2d Cir.1990)]. Just as defense counsel often will alter the argument made to the court at sentencing once counsel is given notice of the court's intention to depart upward, *see id.,* so too might the focus of the government's presentation prior to the imposition of sentence change if it is informed of the court's intention to depart downward. For example, notice will direct the government to address the technical questions presented by the Guidelines such as whether a departure is permitted on the basis of the factors raised by the sentencing court. Furthermore, notice will permit both parties to develop the record further, giving the sentencing court a sounder basis for assessing the contemplated departure and making appellate review of a departure easier.

909 F.2d at 63–64.

At sentencing, the District Court acknowledged that Thorn had raised numerous grounds for downward departure and then stated that "another factor is the criminal history." This language suggests that the District Court at sentencing was raising for the first time the issue of whether Category II overrepresented the seriousness of Thorn's criminal history, an issue that Thorn had not raised specifically in his sentencing memoranda or orally before the District Court. By not informing the government prior to sentencing of its intention to depart downward on the ground that Thorn's Criminal History score overrepresented the seriousness of Thorn's criminal history and providing the government an opportunity to research and present its opposition to this intended departure, the District Court did not comply with *Jagmohan* and *Alba.* Thus, we conclude that the government did not forfeit its argument that the District Court abused its discretion in granting a downward departure from Category II to I.[17]

---

**17.** Although arguably the court need not put the government on notice of a possible ground for departure if the defendant, for example, did so, *cf. United States v. Contractor,* 926 F.2d 128, 131–32 (2d Cir.) ("So long as the defendant is adequately warned that he faces the possibility of an upward departure so that he will not be unfairly surprised and will have adequate opportunity to argue against it, the concern is satisfied, regardless of whether the defendant receives notice from the judge or from another source."), *cert. denied,* 502 U.S. 838, 112 S.Ct. 123, 116 L.Ed.2d 91 (1991), here, the defendant did not adequately warn the government of the possibility of a downward departure on this specific ground. The second addendum to the PSR, which contained a general statement that Thorn intended "to argue for a downward departure based on the Adequacy of Criminal History Category (Policy Statement) at U.S.S.G. § 4A1.3 [sic]," is dated October 28, 2001, two days prior to sentencing. The government claims, and Thorn does not dispute, that this second addendum was given to the government "immediately prior to the sentencing." Such twelfth-hour notice arguably did not provide the government with reasonable advance notice such that the government had a full opportunity to challenge § 4A1.3's applicability prior to sentencing. *Cf. id.* at 132 (noting that the party had access to the PSR, which indicated the possible ground for departure, "substantially prior to sentence and [therefore] had full opportunity to challenge its findings and recommendations" prior to sentencing). *See generally* Fed.R.Crim.P. 32(e) ("The probation officer must give the presentence report to the defendant, the defendant's attorney, and an attor-

*See Alba,* 933 F.2d at 1120 ("[The government] can scarcely be penalized for failing to raise issues before the district court of which it had no notice. Hence, the government is entitled to advance these arguments on appeal.").[18]

■ Although whether a Criminal History score significantly overrepresents the seriousness of a defendant's criminal record may be a permissible ground for a downward departure, *see* U.S. SENTENCING GUIDELINES MANUAL § 4A1.3 (2000), the District Court did not articulate its findings of fact or conclusions of law that support a finding that Category II significantly overrepresented Thorn's criminal history.[19] Absent some explanation of its reasoning, we are unable to assess whether the District Court abused its discretion in granting a downward departure on this ground. Thus, we remand this issue to the District Court for specific findings consistent with this opinion. *See United States v. Tropiano,* 50 F.3d 157, 162 (2d Cir.1995)

("We will vacate a sentence and remand for resentencing if the district court fails to follow the procedures for making such a departure."); *United States v. Moore,* 968 F.2d 216, 225 (2d Cir.) (holding that "in making [a departure on the ground that defendant's criminal history category significantly overrepresents the seriousness of a defendant's criminal history], the sentencing judge must state the 'specific reason' for doing so") (citing 18 U.S.C. § 3553(c)(2) (1988) and *Cervantes,* 878 F.2d at 54), *cert. denied,* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 385 (1992).

## III. *Defendant's Rule 29 Motion for Judgment of Acquittal*

■ The defendant cross appeals the District Court's denial of his trial motion for judgment of acquittal with respect to the money laundering count.

As we have summarized:

---

ney for the government at least 35 days before sentencing unless the defendant waives this minimum period."). Moreover, the hypothetical and general statement in the second addendum to the PSR did not provide the government "notice of the court's intention to depart, including 'the factors that the judge is planning to rely upon and . . . some brief explanation as to why these factors warrant a departure,' and an opportunity to be heard as to why the contemplated departure is unwarranted," as *Jagmohan* requires. 909 F.2d at 63 (quoting *United States v. Kim,* 896 F.2d 678, 681 (2d Cir.1990)).

To the extent Thorn is correct to assume that the probation officer orally informed the District Court that the defendant requested a downward adjustment to his criminal history score, based on the "ancient" age of his prior convictions, such an oral motion to the District Court at the time of sentencing similarly does not provide adequate advance notice to the government, as is required by *Alba* and *Jagmohan. See supra.* Moreover, there is no suggestion in the record that the probation officer orally informed the District Court of

the defendant's motion in the government's presence such that the government had notice, adequately in advance of sentencing or not, of the motion.

18. In so ruling, we in no way endorse the government's silence at Thorn's sentencing. Rather, the government should have requested permission of the District Court to state on the record its opposition to the downward departure. If the government was unable to make a thorough argument as a result of the notice failure, then it should have stated its objection to the departure based on inadequate notice or requested an adjournment of the sentencing to permit it to research the legal and factual issues presented by the departure.

19. We note that the District Court found that Category II overrepresented the seriousness of Thorn's criminal history; it did not find that Category II *significantly* overrepresented the seriousness of Thorn's history, which is the recognized ground for departure. *See* U.S. SENTENCING GUIDELINES MANUAL § 4A1.3 (2000).

We review a denial of a motion for acquittal to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). "[A]ll reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense." *United States v. Artuso,* 618 F.2d 192, 195 (2d Cir.1980) (quoting *United States v. Skinner,* 425 F.2d 552, 554 (D.C.Cir.1970)). *United States v. Writers & Research, Inc.,* 113 F.3d 8, 11 n. 3 (2d Cir.1997).

The indictment charged Thorn with conspiracy to commit promotion money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(1), which makes it a crime when one, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity." The indictment named mail fraud as the specified unlawful activity that Thorn allegedly sought to promote through his financial transactions. Thus, although the government did not charge Thorn with mail fraud, it had to prove beyond a reasonable doubt that Thorn had intended to promote mail fraud through his financial transactions. *See United States v. Pierce,* 224 F.3d 158, 162 (2d Cir.2000).

We have found that the language of § 1956(a)(1)(A)(i) demonstrates that Congress

> sought to reach conduct that went beyond the concealment of proceeds of criminal activity. Indeed, the words of this provision of the statute, in conjunction with the definitions provided in 18 U.S.C. § 1956(c) (1988), demonstrate that Congress intended to make unlawful a broad array of transactions designed to facilitate numerous federal crimes.

*United States v. Skinner,* 946 F.2d 176, 178 (2d Cir.1991) (footnote omitted).[20] *Skinner* involved the use of the proceeds of sales of narcotics to purchase postal money orders and to mail these money orders to pay the out-of-state source of the drugs, who had fronted the drugs to the seller. We concluded that the money laundering statute covered this conduct, even though any promotion of the drug trafficking conspiracy "was *de minimis,* because the transactions in reality represented only the completion of the sale." *Id.* at 179. In *United States v. Piervinanzi,* 23 F.3d 670, 679 (2d Cir.), *cert. denied,* 513 U.S. 900, 115 S.Ct. 259, 130 L.Ed.2d 179 (1994), we determined that the transfer of funds overseas did not merge with the underlying bank fraud. We reasoned that since the transfer "was integral to the success of both fraudulent schemes, it is undeniable that the attempted transfers were designed to 'promote' the underlying crime of bank fraud." *Id.*

The defendant argues that this Circuit (as well as several others) wrongfully permits convictions for promotion money laundering based merely on evidence that the proceeds of a fraudulent scheme were

---

**20.** In reaching this conclusion in *Skinner,* we noted that the defendant, like Thorn, had not pointed to any legislative history to contradict the plain language of the statute; nor had our independent review of the legislative history provided any reason for us to find otherwise. 946 F.2d at 178.

received and deposited in a financial institution. The defendant urges us to adopt the reasoning of cases from the Fifth, Seventh, and Eleventh Circuits [21] and find that promotion money laundering requires the expenditure of unlawful gains with the specific intent that the expenditure will advance and further the unlawful activity.[22] The defendant maintains that merely spending money obtained through mail fraud on legitimate office expenses does not, as a legal matter, constitute promotion money laundering.

First, the defendant's claim that we (wrongfully) permit conviction under the money laundering statute upon evidence of mere receipt and deposit of funds is misleading. Rather, as *Skinner* and *Piervinanzi* instruct, we demand evidence that the receipt and deposit of laundered funds was made with the intent to promote the specified underlying unlawful activity, be it, for example, by promoting continued illegal activity or by being essential to the completion of the scheme.

Moreover, given the deferential standard of review that applies to this appeal, there was ample evidence, drawing all inferences in the government's favor, from which a reasonable jury could conclude that Thorn and his confederates deposited the funds into their operating accounts with the intent to promote the continuation of the scheme. An office manager, Dawn Dayter, testified that the funds were used, in part, to "finance the next project." When asked if this process would "continue for each of the projects that occurred during the course of [her] employment where improper activities occurred," she replied, "yes." And numerous former employees testified that the standard operating instructions from Thorn were to promise full compliance with federal and state laws; to mail contracts that purported to create a legal obligation to keep this promise; to mail falsified test results to clients to perpetuate their belief that this promise had been kept, but to violate regulations to save money and time. Thus, a reasonable juror could infer from this evidence that Thorn and his cohorts intended, with each deposit, to fund future projects that would similarly involve mail fraud. The deposit was not merely the completion of the

---

**21.** *See United States v. Olaniyi–Oke*, 199 F.3d 767, 770 (5th Cir.1999); *United States v. Brown*, 186 F.3d 661, 670 (5th Cir.1999); *United States v. Jackson*, 935 F.2d 832, 842 (7th Cir.1991).

**22.** The government asks us to review defendant's cross appeal for plain error, as the defendant made a different argument to the District Court. *See United States v. Delano*, 55 F.3d 720, 726 (2d Cir.1995). Although the defendant failed to submit a reply to this argument, a review of the defendant's oral Rule 29 motion reveals that the defendant argued that there was

> no evidence to indicate that Mr. Thorn was promoting a continuing scheme of fraud. What we have here, Judge, is a lawful business that is acting unlawfully, not in whole but certainly in part, there were revenues generated that were used, that were plowed back into the business for salaries and removal operations that actually did benefit the clients. And in those—in that context, Judge, we would propose to the Court that there is not an adequate basis to bring this money laundering count.
>
> Also with respect to the very—the manner in which the indictment and the proof has come in, this is essentially a receive and deposit case which is inconsistent with the theory underlying money laundering counts, and we would ask at this point that that be dismissed as well on that ground.

The defendant did not specifically ask the District Court to adopt the reasoning of other circuits and reject existing precedent from this Circuit, but he did present a substantially similar legal theory to the Court at trial. It is not necessary, however, to resolve this question of the applicable standard of review because we would affirm the District Court under either standard.

scheme but enabled the conspirators to continue conducting the illegal abatement scheme.

Thus, we find that the District Court did not err in denying Thorn's Rule 29 motion, even under defendant's restrictive theory of promotion money laundering.

## Conclusion

For the reasons stated above, we vacate the sentence imposed and remand to the District Court for resentencing. We affirm the District Court's denial of defendant's Rule 29 motion.